CANDLER-HILL CORPORATION,

*vs.*

SEMINOLE OIL & GAS CORPORATION, and JACK R. GAMMEL.

*New Castle, May 8, 1953.*

*Richard F. Corroon*, of Berl, Potter & Anderson, Wilmington, for plaintiff.

*William H. Foulk* and *Edward W. Cooch, Jr.*, Wilmington, for defendant Jack R. Gammel.

Defendant Seminole Oil & Gas Corp. appeared without counsel.

SEITZ, Chancellor: This is the decision after final hearing on an action to recover certain shares of stock of the defendant corporation formerly owned by plaintiff corporation but now registered in the name of the individual defendant.

Plaintiff, Candler-Hill Corporation, is a Michigan corporation. In 1942 Thomas B. Wright, and his partner, Fain Gillock,

acquired stock ownership of plaintiff. In 1944, 50% of the stock was owned by Merrel Merke, Gillock's daughter, 40% was owned by Wright's daughter, Phyllis Turner, and 10% was owned by Vera L. Mario, secretary of the plaintiff. Although Wright apparently never owned any of plaintiff's stock after 1944, from September 12, 1945 until the date of his death on February 25, 1950, he exercised 100% voting control as voting trustee of all of plaintiff's outstanding stock. Wright was also president of plaintiff although he apparently lived in New York and spent only part time at the plaintiff's plant in Michigan.

Plaintiff corporation manufactured a small pump for the Armed Forces which was stamped with the trade name "Titan". In 1942 Titan Pump & Engineering Corporation (hereafter called "Titan") was incorporated as a wholly owned subsidiary of plaintiff. However, Titan was for all practical purposes wholly inactive until January 1, 1949.

Early in the war plaintiff built a new plant in Detroit which had 32,000 square feet of floor space and in which almost 1,000 employees worked in 1944. Prior to VJ Day on August 15, 1945, plaintiff's business was exceedingly profitable. It showed dollar sales of $4,229,378 and a net profit of $163,000 in 1943; sales of $7,414,514 and a net profit of $263,000 in 1944; and sales of $3,733,054 and a net profit of $73,935 in 1945.

When VJ Day arrived it spelled financial disaster to plaintiff. All of its government contracts were canceled and plaintiff in a twinkling was changed from a highly successful "war baby" to a competitor in a civilian market. Its civilian efforts were far from successful. Thus, in 1946 its dollar sales were only $315,000, in 1947, $779,000, and in 1948, $386,000. In each of these years it suffered substantial losses on sales and on an over-all basis. In 1946 plaintiff's many creditors began pressing for payment. During 1947 and 1948 there were about fifteen or twenty creditors' suits pending. In addition, the United States Government was making various substantial claims against plaintiff. The creditors' and the government's claims were in excess of $500,000.

Despite its insolvent position, plaintiff struggled along and as

late as 1947 employed about 200 people. Finally, in July 1948, plaintiff entered into an agreement with Indian Motorcycle Company under which Indian took over the operation of the Detroit plant. This lasted only a short time, and near the end of 1948 plaintiff moved to a much smaller plant at Novi, Michigan.

As of January 1, 1949 plaintiff ceased all operations and transferred to its wholly owned subsidiary, Titan, all of its machinery and equipment, all of its inventories, all accounts receivable and 60,000 shares of Seminole stock. The actual transfer was made about February 10, 1949. At about the same time the manufacturing operations were transferred from the 32,000 square foot Detroit plant to the 11,000 square foot Novi plant. In exchange for its assets Titan delivered to plaintiff its notes in the principal amount of $310,000 payable over a ten year period.

Aside from the notes from Titan, plaintiff's only assets after January 1, 1949 were its 100% stock ownership of Titan, some remaining shares of Seminole and a note from Midland Realty Corporation to whom plaintiff had lent the money to buy the Novi plant. Of course, there were still accounts payable of about $550,000.

Titan's operations after January 1, 1949 produced some profits and were used to pay off plaintiff's creditors in part. Although successful, Titan's operations were considerably smaller than those of plaintiff during the years prior to the transfer of assets. For example, gross sales in 1949, 1950 and 1951 averaged about $166,000 a year. Also Titan never employed more than twenty persons as compared to approximately two-hundred employees of plaintiff in 1947.

This is a dispute between plaintiff and the individual defendant, Gammel, as to whether or not he legally is entitled to the 20,000 shares of Seminole stock which he holds. He claims 6,400 shares were delivered to him by plaintiff's president on account of unpaid wages and loans to plaintiff. He claims the balance was taken by him to apply against unpaid salary due from plaintiff after January 1, 1949. Since Seminole is only a nominal defendant, future reference to "defendant" will embrace only Gammel.

In resolving the ownership problem it is important to trace defendant's connection with the plaintiff corporation. Defendant came with plaintiff in 1942 as office manager at a salary of $200 per month. Defendant advanced in his connection with plaintiff until on October 1, 1946 he was made executive vice president and his salary was increased to $1,000 per month. He had already been made treasurer and he retained that position after October 1, 1946. As executive vice president he acted as president and ran the company in Wright's absence. This was most of the time because Wright visited the plant only one or two days a week. In 1946, while the company had a vice-president in charge of production, defendant was his superior and was concerned with all types of suits, labor troubles, creditors, sales, etc. While there may have been some variations, it appears that defendant's activities on behalf of the plaintiff corporation were substantially the same in 1947 and 1948 as they had been in 1946. In 1948 Wright's visits to the plant became even less frequent because of his illness.

After January 1, 1949, plaintiff was president of Titan and received $1,000 per month salary; being the same amount he had received from plaintiff prior to 1949. He continued as an officer of plaintiff and although he received no salary payments from plaintiff, a salary for him was accrued on plaintiff's books at the old rate of $1,000 per month. This is one of the crucial facts in the case.

At the time plaintiff transferred most of its assets to Titan there were past due salaries owing by plaintiff to three of the executive employees—Wright, Gammel and Mario. On January 11, 1949 Wright, as plaintiff's president, wrote to defendant offering to settle the matter of defendant's past due salary for the period ending December 31, 1948 by delivering to him 4,400 shares of Seminole stock owned by plaintiff. Defendant accepted this offer and released any claim for salary or other advances up to December 31, 1948.

It is now important to consider the evidence in relation to the Seminole stock owned originally by plaintiff. Plaintiff originally owned several hundred thousand shares of Seminole stock. While some were registered in plaintiff's name and others in Wright's

name, all were owned by plaintiff. The certificates were for the most part kept in Wright's custody in New York. Some Seminole shares were admittedly used from time to time to pay back salaries.

To bring into focus the issues concerning the Seminole shares in dispute it is best to trace the pertinent transactions where Seminole shares were involved. Because of defendant's conflicting versions of the transactions it is difficult to determine how he came in 1948 to receive the first 2,000 shares of Seminole stock in dispute. At the trial he claimed that he received these 2,000 shares in payment of a $2,500 note given him by the plaintiff in return for a cash loan to it. At a pre-trial deposition he said the note had been paid and the 2,000 shares were received as a bonus.

Plaintiff claims that the only logical inference is that the 2,000 shares were taken by Gammel without authority or, if delivered by Wright, constituted an illegal gift. Some confusion is understandable in view of the "informal" manner in which much of the plaintiff's business was done. Although defendant's testimony was not too satisfactory I am not persuaded that the 2,000 share transaction should be upset when I think it fair to infer that they were issued to defendant with Wright's approval. Wright was president and had the final control. I find no basis for a conclusion that he made a gift of corporate assets. Taking defendant's word that the stock was for the note, I believe defendant properly received the 2,000 shares. However, the note should be delivered for cancellation as a condition to the release of any Seminole shares to defendant.

In January, 1949 defendant received 4,400 shares of Seminole stock in payment of his salary up to December 31, 1948. This is not disputed.

Defendant testified that Wright borrowed the 6,400 shares of Seminole stock from him later in 1949 although he was not sure whether they were borrowed by Wright for his personal use or on behalf of plaintiff. These shares apparently were not registered in defendant's name. About the middle of 1949 Wright returned to defendant 6,000 of the 6,400 shares allegedly lent to plaintiff. Plaintiff here argues that since it was not shown to be an obliga-

tion of plaintiff, the plaintiff cannot be charged with the 400 share shortage claimed by defendant.

I think it fair to infer that whatever shares defendant lent Wright constituted a loan for corporate purposes. Defendant's uncertainty is understandable in view of Wright's "informal" methods. The evidence shows that over the years Wright apparently borrowed Seminole shares and money for the corporation as the occasion demanded. I, therefore, conclude that while Wright borrowed 6,400 shares of Seminole stock for corporate purposes he did "short" defendant some 400 shares when he returned only 6,000.

Plaintiff in the course of its business borrowed money from time to time from M. L. Pardee & Company on the security of Seminole stock. Two of those transactions are here important because they were the vehicle whereby defendant obtained the remaining 13,600 shares of plaintiff's Seminole stock in dispute.

On February 17, 1949 defendant on behalf of plaintiff pledged 10,000 shares of Seminole stock with Pardee as security for a loan to plaintiff and Titan. Upon repayment of the loan by plaintiff, the certificates for 10,000 shares of Seminole were returned by Pardee. On August 16, 1950 defendant took possession of these certificates and had them transferred into his own name.

On February 10, 1950 defendant pledged an additional 10,000 shares with Pardee as security for a loan to Titan. When the loan was repaid and the shares returned defendant had them transferred to his name.

Defendant says the first 10,000 shares returned by Pardee were applied by him against back salary due him by plaintiff. Defendant claims that 6,400 of the second 10,000 shares were his shares —6,000 having been lent for plaintiff's benefit and 400 representing the previous shortage. Plaintiff concedes that if I should find, as I have, that defendant owned 6,400 shares then I may properly conclude that defendant was entitled to retain 6,400 shares of Seminole when the second 10,000 shares were returned by Pardee. I so conclude.

Defendant claims that he rightfully applied the remaining 13,600 shares against the accrued and unpaid salary owed him by plaintiff from January 1, 1949 to the date of the termination of his services. As an alternative, he counterclaims for such pay, if it be found that he was not authorized to apply the 13,600 shares of Seminole stock for that purpose.

Before the question of defendant's authority to apply the Seminole shares is considered, another question must be answered. Was defendant actually owed back salary by plaintiff for the period after January 1, 1949? The parties agree that the answer to this question must be found in the Michigan law but I conclude that under Michigan law corporate assets cannot be given away or taken without consideration.

Plaintiff claims that he not only was entitled to the $1,000 a month actually paid him by Titan after January 1, 1949 but was also entitled to the $1,000 per month accrued from that date on the plaintiff's books as salary. It would serve no purpose to review in great detail the services performed by defendant before and after January 1, 1949. It is patently evident to me from the evidence that defendant did not "earn" salaries from both corporations. These two corporations were really one and the asset transfers, etc., did not change the substance of the transaction. Defendant's work after 1949 was substantially the same as immediately before.

It is quite apparent from the evidence that the purported salary for defendant was accrued on the plaintiff's books after January 1, 1949 as a device to procure potential tax benefits. The evidence makes this clear. This court takes notice of the obvious tax value of merging a corporation with a large tax credit and a corporation making substantial profits. While these accruals were made at Wright's direction, I find as a fact that both Wright and the defendant understood that they were not intended to constitute a due and payable salary. I find further that defendant understood that after January 1, 1949 his salary should come from Titan—as it did. This disposes of defendant's argument that he had a salary agreement with plaintiff which was never terminated. It should be recalled that Titan was wholly owned by plaintiff and it is not without significance that nothing was done by defend-

ant to collect this "salary" from plaintiff until after Wright's death and then in a way somewhat unbecoming a fiduciary.

The accrued salaries were in my opinion intended as a disguised gift at the government's expense in the event the plaintiff's status became such that the accrued salaries could be realized in that way. Mr. Wright directed a similar accrual for himself but never took any compensation therefor. I conclude that by directing these accruals, Wright did not intend and defendant was then aware that Wright did not intend that they should become a present obligation of the corporation. Nothing has happened to plaintiff which would justify the conclusion that the contemplated tax benefit was ever realized.

■ Defendant says plaintiff may not assert that the accruals were a device to profit at the government's expense because it places plaintiff in the position of one coming into court with unclean hands. I do not believe wrongful action of a corporate executive with another executive can form the basis for precluding the corporation from remedying the wrong, particularly where other innocent parties had an interest in the corporation at the time.

Defendant admittedly took the 13,600 shares of Seminole stock to apply against salary accruals in his name on plaintiff's books and I find that there was to defendant's knowledge no consideration for such accruals. Nor was there any subsequent action which converted any of the accruals into subsisting obligations. Defendant says that in March, 1950 Vera Mario, secretary and voting trustee with 100% control, recognized that a salary for her for 1949 accrued on plaintiff's books was due and owing. Conceding this to be so, it does not help defendant in view of my finding that defendant provided no consideration for his accruals. It is also noteworthy that Miss Mario's salary after January 1, 1949 was divided between plaintiff and Titan but the aggregate was the same as before January 1, 1949—under defendant's claim his total compensation was doubled.

Defendant next says the alleged corporate minutes of September 30, 1950 show a ratification of defendant's salary from

plaintiff. The short answer must be that I cannot so construe them. Nor do I find any basis for applying an estoppel against plaintiff.

Finally defendant says a resolution of the board of directors dated April 30, 1949, which set up a procedure to apply Seminole stock against salary claims, authorized him to take the shares. First of all, there was no consideration for his taking the 13,600 shares. There is, therefore, no need to consider whether the wording of the resolution authorized the taking of shares by defendant for his own benefit without making a request or disclosure to any other corporate official.

I conclude that defendant was not owed any salary by plaintiff after January 1, 1949 and that defendant is not entitled to the 13,600 Seminole shares. This is true without regard to the legality of his method of acquiring them. It follows that there is no merit to his counterclaim for such salary. It will be dismissed.

Plaintiff is entitled to have 13,600 shares of the sequestered Seminole stock returned to it.

Order on notice.