Jack R. Gammel,
Appellant,

*vs.*

Candler-Hill Corporation,

and

Seminole Oil & Gas Corporation,
Appellees.

*Supreme Court, On Appeal, March 12, 1954.*

SOUTHERLAND, Chief Justice, TUNNELL, Justice, and CAREY, Judge, sitting.

*William H. Foulk* and *Edward W. Cooch, Jr.*, Wilmington, for appellant.

*Richard F. Corroon*, of Berl, Potter & Anderson, Wilmington, for appellees.

TUNNELL, Justice, for the court:

Candler-Hill Corporation, a corporation of the State of Michigan, brought suit in the Delaware Court of Chancery against its president, Jack R. Gammel, seeking immediate sequestration and ultimate recovery of certain shares of common stock of Seminole Oil and Gas Corporation. The complaint alleged that the stock in question had been owned by Candler-Hill, but that, without the authority or even the knowledge of the Candler-Hill board of directors. Gammel had caused it to be transferred to himself as a credit on a false claim for unpaid salary. For sequestration purposes, Seminole was also joined as a party defendant. Seminole is a Delaware coropration; hence the venue.

Defendant Gammel denied that there had been any irregularity in the means he employed to get the stock, but, guarding against the contingency of his being compelled to surrender the stock, he filed a counterclaim in the action, alleging the above-mentioned debt of

Candler-Hill for back salary and praying for money judgment in his favor in the sum of $37,000, with interest. Issue was joined on both the complaint and counterclaim, and trial was held on both.

The Chancellor found [1] Candler-Hill entitled to recover a portion of the stock in question. Instead of confining his holding to the irregularity of Gammel's method of obtaining the stock, however, the Chancellor went straight to the root of the controversy and held Gammel's claim for salary to be unfounded. Thus, by resolving the one issue, he answered both questions. The Chancellor directed relief substantially as prayed for in the complaint and dismissed the counterclaim.

Following the decision below, Gammel elected to bow to the Chancellor's order in so far as the stock itself was concerned, so he surrendered what the Chancellor had ordered him to surrender, but he appealed from the Chancellor's dismissal of the counterclaim. That appeal is the action before us.

Little being involved here except questions of fact, study must be given to the setting.

At all times with which we are concerned, the stock in Candler-Hill was owned by persons who were in some way associated with a man by the name of Thomas B. Wright. For several years past 80 per cent of it has been owned by Wright's daughter, Phyllis Wright Turner, and 20 per cent by Wright's secretary, Vera L. Mario. Under a voting trust agreement, Wright, until his death, held and exercised the voting rights in all the outstanding stock. He served as a director and as president of the company. During Wright's life no other director, and no stockholder at all, took any responsibility in company affairs. Thus, the mode of operation was characteristic of many one-man corporations. Such formalities as minutes were not ignored, but minutes were made to conform to actions, rather than actions to minutes.

Mr. Wright died on February 20, 1950. Since his death the voting rights have been held and exercised by Miss Mario.

1. By opinion reported in 33 *Del.Ch.* 514, 96 *A.2d* 577.

Gammel had gone to work for Candler-Hill as an office manager in 1942 at a salary of $200 per month. He advanced rapidly until, on October 1, 1946, he was made executive vice-president. He had previously been serving as treasurer, and he also retained that office. He had no written contract of employment, but upon the occasion of his election as executive vice-president, Wright sent him the following note:

"Memorandum from Thomas B. Wright

To—Jack Gammel—

Effective 10/1 set yourself at $1000 per month—

T. B. W.

10/4/46."

On October 1, 1946, Gammel was serving other Wright corporations, including Seminole, but Candler-Hill was the only one paying him any compensation, so Candler-Hill, as of that date, increased Gammel's salary to $1,000 per month.

During World War II Candler-Hill had manufactured fuel pumps for aircraft. Its plant was in Detroit, Michigan, where it maintained up to 1,000 employees. It was successful as a war operation, but with the advent of peace it became very unsuccessful. It promptly scaled down its operations so as to employ only about 200 people, but, nevertheless, it lost large amounts of money in 1946, 1947 and 1948. At the end of 1948, it had accumulated adverse creditors' claims in excess of half a million dollars and was in a seriously insolvent position. The management of Candler-Hill in this situation was under the necessity of striving to accomplish two things: (a) to carry on the manufacturing operation so economically and so efficiently as to convert operating losses into profits, and (b) to hold off creditors long enough to enable such profitable operations to restore the concern to solvency.

In that emergency, and in the hope of achieving those two aims, Mr. Wright effected two changes—one legal, and one operational. Candler-Hill sold its manufacturing facilities, inventories, accounts receivable, and some of its Seminole stock to a wholly-owned sub-

sidiary, Titan Pump and Manufacturing Company, taking notes in payment. The manufacturing operation was moved to a very small plant at Novi, Michigan, and was much curtailed in size, so as to employ only about 20 people. Candler-Hill, now a mere holding company, was left to struggle with the creditors, and the creditors with it. Candler-Hill's assets after the transfer consisted of these items: 100 per cent ownership of the Titan stock, notes of Titan and of Midland Realty Company,[2] and a quantity of Seminole stock. At the time of these moves, Candler-Hill settled with Gammel for all his unpaid salary, which was five months delinquent, making payment in Seminole stock. Accounts were thus squared to January 1, 1949. Gammel was elected president and treasurer of Titan, and Titan, without entering into a formal contract of employment, immediately began to pay Gammel the same salary he had theretofore been earning from Candler-Hill, $1,000 per month.

Midland and Seminole continued to pay Gammel no compensation, but Gammel's old salary was never cancelled on the books of Candler-Hill, being left to appear as a continuing, accruing liability. Thereby hangs this tale.

The first inquiry is as to what happened on January 1, 1949; that is, did Gammel's salary with Candler-Hill stop when his salary with Titan started, or was he thereafter to receive both salaries?

Gammel, as plaintiff on the counterclaim, testified that his old arrangement with Candler-Hill was never terminated. He adduced verbal corroboration of that testimony. This, of course, is the nub of Gammel's case. There is no record of any express termination. Moreover, the periodical entries upon the books of Candler-Hill, authorized by Mr. Wright, and the corporation's corresponding income tax returns, are further proofs of at least *prima facie* character.

The Chancellor, however, adopted an interpretation of the circumstances sharply at variance with the view urged by Gammel. He concluded that neither Gammel nor Wright had ever intended· for

2. Another of the Wright corporations which Gammel served without compensation moving from it. This particular corporation was used to purchase the Novi plant for Titan to use in its efforts to restore the solvency of Candler-Hill.

any such duplicate salary to be a genuine liability of the company, and that the showing of it on the corporation's books and tax returns had been simply a device for doing the government out of income tax in the event that the corporation should some day make a large amount of money.

Gammel contends that in order to arrive at this finding the Chancellor had to go outside the record. He urges that there is nothing in the case which will even begin to offset the admittedly persuasive circumstance that the corporation's books support Gammel. Our duty, therefore, is to see what, if any, evidence supports the Chancellor.

We are first reminded that on Jan. 1, 1949, Candler-Hill was in desperate financial straits. The choice was either to begin making a profit immediately or to fail irretrievably. Moving to a small plant in a small community and vastly scaling down the scope of the manufacturing operation were steps calculated to promote economy and efficiency. To double the salary of an operating officer like Gammel would have been strangely out of harmony with these two measures.

Moreover, the record shows Wright to have been a man who devoted thought to income taxes. The entire income of Candler-Hill, after Jan. 1, 1949, was limited to interest on notes and dividends on stock of Titan and Seminole. It would have been most improvident for Wright deliberately to impose unnecessary overhead upon the parent company instead of assigning it to the operating company. And especially is this so where, as here, the parent company, by virtue of a recent history of devastating losses, had accumulated a large income tax credit.

The Chancellor regarded Gammel's salary arrangement and Wright's as being in similar status. Wright had received $18,000 annually from Candler-Hill before 1949. Thereafter he received $5,000 from Titan, while his old salary at Candler-Hill was left "accruing" on the books. The Chancellor found that neither Wright nor Gammel was supposed to collect his post-1948 salary from Candler-Hill. If the Chancellor's conclusion was the right one, Wright, upon finding his enterprise in grave distress, took a cut in his own salary, leaving Gammel's the same. If Gammel's contention is right, however, Mr. Wright

took that occasion to increase his own salary and to double Gammel's. Common sense favors the Chancellor's view.

Further, it must not be overlooked that on January 1st, 1949, Candler-Hill stopped paying Gammel. And the Chancellor found significance in the further circumstance that "nothing was done by defendant to collect his salary from plaintiff until after Wright's death." This means that nearly fourteen months passed with no Candler-Hill salary being paid and none demanded—an astonishing placidity!

In May, 1950, a few months after Mr. Wright's death, Gammel compiled what he termed a "detail (sic) breakdown of Candler-Hill's Accounts Payable", in which he listed 106 debts, but neither Gammel's own salary nor Wright's was included. If these salaries were *bona fide* debts, it is not easy to understand their omission.

The details of the tax-fraud scheme, for obvious reasons, are not a matter of record. Yet we cannot refrain from the suggestion that certain testimony of Gammel's in respect to Seminole may have an interpretative value in respect to Candler-Hill:

"Q. Were you ever an officer of Seminole Oil Corporation, Mr. Gammel? A. Yes, I was.

"Q. Did you ever get any salary? A. I don't believe so. *I think we signed a certificate to give it back to them.*

"Q. You mean a release of salary or waiver of salary? A. That's right."

Along this same line, the testimony of Miss Brady, Gammel's secretary, as to Mr. Wright's directions to her to enter these accruals on the books is capable of a construction other than the one Gammel puts upon it. For instance, her vague reference to the government in the following quotation may be interpreted as lending inferential support to the Chancellor's view:

"Q. Did he tell you why he was giving you those instructions that he gave you? A. Yes, he wanted them accrued, because Candler-Hill, although it was inactive, the company still had a lot of dealings still active, so that they had to be active,

and he felt that they should have a salary, and although the company didn't have the money to pay for it, he wanted it accrued, because of the Government, and so forth, because if they ever did get any money, then they would be repaid, and he wanted them accrued. He was a strong believer in—."

In view of the record support for numerous factual inferences sustaining the corporation's position, it is not surprising that the Chancellor reached the conclusion that Gammel's duplicate salary was a sham.

It is urged, however, that Gammel had to be paid by Candler-Hill because his duties to Candler-Hill still continued. This is a half truth. After January 1, 1949, his same managerial duties for Candler-Hill were simply channeled by a legal artificiality into two corporate courses, instead of one as theretofore. The Chancellor was on eminently sound ground in insisting upon looking at the picture at large and in holding that this change made no real addition to Gammel's previous duties. In fact, he could have added emphasis—admittedly not needed—by pointing out that the responsibility for oversight of personnel was immensely reduced when the number of employees was brought down from 200 to 20.

Gammel argues that his case is aided, or perhaps established, by the failure of Phyllis Wright Turner, a director and the holder of 80 per cent of the stock, to take the stand as a witness, citing *Jett v. Texas Co., (D.C.Del., 1947)* 73 *F.Supp.* 699, 704. The cited authority has no application, however, for Gammel failed to establish that Mrs. Turner had knowledge of anything as to which she would have been permitted to testify. The record is clear that she took no part in company affairs, and her verification of the complaint, upon which Gammel relies to prove her knowledge, was only on "information and belief". But even if the inference were a proper one, it is still only one among a multitude of conflicting factual considerations which the Chancellor was forced to evaluate. Such a mere inference is not to be confused with a consideration having conclusive force.

■ Gammel next relies upon something akin to estoppel. He insists that if the corporation put this salary on its books for the purpose of defrauding the government, it is thereby saddled with the obligation and that permitting the corporation to wriggle out would be allowing it to take advantage of its own fraud, which equity will not tolerate.

This is a misapplication of an acknowledged principle. If Wright or Candler-Hill set out to defraud the government by pretending to owe Gammel something which was not in fact owed, then an equitable right is thereby generated in Gammel, he says, entitling him to recover judgment. This is a statement of some primitive principle of vengeance which, upon fleeting glance, seems to have a wholesome appearance, but which will not stand scrutiny. If this was a scheme to defraud the government, the wrongdoing in this case would create rights in the government but could avail Gammel nothing. His claim must rest upon the existence of an understanding that he was to be paid two salaries, and, as we have seen, the evidence amply justifies the Chancellor's holding that he was not.

■ Gammel next says that, irrespective of the genesis of his second salary, Candler-Hill ratified the pretended obligation so as to become bound to pay it.

The facts upon which this alleged ratification is grounded all relate to a certain meeting of the Candler-Hill directors at Novi, Michigan, on November 14, 1950. The meeting was called upon the discovery that Gammel had transferred some of Candler-Hill's Seminole shares to himself. The corporate minutes summarizing what transpired on that occasion are lengthy, but Gammel points to three matters within their compass, each of which, he insists, establishes his claim.

To begin with, the minutes refer without disapproval (or approval) to an income tax return in which a schedule shows the "accrual" of Gammel's salary. We scarcely comprehend the argument Gammel seeks to build upon this circumstance. The income tax return cannot disprove the Chancellor's finding of a fraudulent

scheme; indeed, it was an indispensable step in the execution of such a scheme.

Next, the minutes show that Gammel was reelected president and treasurer. This would not have been done, says Gammel, if his act of seizing Seminole stock to pay his claim for salary had been fraudulent. We agree that it would seem an odd thing to do, but there is no call for us to search the circumstances. We do not know what hold Gammel may have had upon the directors, nor whether they had anyone else available who could run the company. But the answer is again that all we are talking about is another among a multitude of inferences of fact. It must be kept in mind that we are not asked whether there are or are not in the record a number of facts upon which the Chancellor could conceivably have come to the opposite conclusion. Of course there are, but that circumstance is irrelevant to the present inquiry. *Pierce v. Wahl, 32 Del.Ch.* 465, 86 *A.2d 757,* 759; *Thomas v. King, 33 Del.Ch.* 470, 99 *A.2d 778,* 781.

Then Gammel emphasizes this excerpt from the minutes:

"It was then proposed that payment of any salary to the President of the corporation, which had been put on the books of the corporation at $12,000.00 per annum, be held in abeyance until the matter of all taxes had been settled with the government, and until such time as the income of the corporation warranted for payment to the President.

"Upon motion duly made, seconded and unanimously ·approved, it was

"Resolved, that the payment of any. salary to the President of the corporation be held in abeyance until such time as the matter of taxes had been adjusted and settled with the United States government."

The point which Gammel here seeks to make might be susceptible of a very short answer. It might be proper to hold that the counterclaim must fall because Gammel—who, as plaintiff in the counterclaim, had the burden of proof—failed to adduce any evidence whatever tending to establish either that the taxes had been settled or that the com-

pany's income had become sufficient to justify the payment of a salary to the president.

Yet we pass over this possibility in order to grapple with the merits. The minutes make it clear that the salary had been "put on the books at $12,000.00 per annum", but they fail to establish a single instance of conflict with the Chancellor's finding that this whole business involves and turns around a fraudulent tax scheme.

Some of the more sinister implications underlying the facts of this case may have made the draftsman of the resolution of November 14, 1950, uncomfortable, and consequently shaky in his choice of language. Certainly the wording is poorly chosen for the expression of any clear meaning. But the minutes, when construed as strongly as possible in favor of Gammel, still fall short of validating what had theretofore been invalid.

The judgment will be affirmed.