BETTY F. LARRIMORE, Widow and Administratrix of the Estate of Charles H. G. Larrimore, Appellant and Cross-Appellee, v. HOMEOPATHIC HOSPITAL ASSOCIATION OF DELAWARE, a corporation of the State of Delaware, Appellee and Cross-Appellant.

(*May* 23, 1962.)

SOUTHERLAND, Chief Justice; WOLCOTT, Justice, and CAREY, Judge, sitting.

*Harold Leshem* (of Leshem and Rubenstein) for appellant and cross-appellee.

*Rodney M. Layton* (of Richards, Layton and Finger) for appellee and cross-appellant.

Supreme Court of the State of Delaware, Nos. 11 and 12, 1962.

WOLCOTT, J.:

These are cross-appeals from an order of the trial judge, entered after a jury's verdict of $30,000.00 for the plaintiff, denying defendant's motion for a directed verdict or a new trial as to the issue of liability, but granting a new trial on the issue of damages only. The plaintiff appeals from the grant of a new trial on the issue of damages. The defendant cross-appeals from the imposition of liability.

In 1954, the decedent, the husband of the plaintiff who brings this action as administratrix, was determined to be suffering from chronic glomerulonephritis. This disease is an inflammation of the various elements of the kidney with the gradual obliteration of them by scar tissue, ultimately result-

ing in the inability of the body to excrete waste materials. When the consequent retention of waste materials transends the point at which the body is able to compensate, renal insufficiency occurs which, if unarrested, results in death.

On September 11, 1959, the decedent was admitted into the defendant hospital for the purpose of determining whether the administration of a certain drug, Ansolysen, might arrest the decedent's malignant hypertension. Prior to his admission, the decedent was aware of the fatal nature of his disease, and that the use of the drug, Ansolysen, was a desperate attempt to arrest its fatal course. He had requested his doctor not to let his wife know that he knew the grave nature of his disease.

The method of administering the drug, Ansolysen, was to be parenterally, or by injection directly into body tissue. The purpose of the selection of this method was to permit an absolute control over the dosages so as to determine whether or not the use of the drug improved or worsened the renal function of the patient. The same degree of control was impossible to obtain by oral administration of the drug.

Upon his admission to the hospital, the decedent commenced receiving injections of one milligram of Ansolysen at periodic intervals. After such treatment over a period of time, it was determined that the injection of the drug was not arresting the course of the decedent's fatal disease. In accordance with his wishes, therefore, his doctor decided to discontinue the injections and send the decedent home for terminal care.

Since, however, the abrupt discontinuance of injections of Ansolysen is apt to bring on complications, the doctor decided to ease off the treatment by a series of oral administrations of the drug. Accordingly, on October 1, 1959, the decedent's doctor entered on the decedent's Hospital Order Sheet a direction to discontinue the injections of Ansolysen and

to commence the administration of Ansolysen by mouth in the amount of twenty milligrams. This was continued on October 2, 1959 by entry on the Order Sheet to continue the dosage by mouth. On October 4, 1959 the physician entered on the Order Sheet the direction to "Increase Ansolysen, 30 milligrams at eight a.m., 30 milligrams at two p.m., and 30 milligrams at eight p.m."

The Order Sheet in the hospital consists of a series of pages clipped together, and is the means used by the doctor to give orders to be carried out by the nursing staff. They are ordinarily attached to something in the nature of a clip board. As a matter of fact, the doctor's orders for October 1 through October 4 were all on one sheet of paper, although the entries preceding October 4 were covered with a number of shorter sheets which, nevertheless, could be raised to read the covered-over entries.

On October 4 a nurse who had been off duty since October 1 and who, prior to going off duty, had administered Ansolysen to decedent by injection, was handed the Order Sheet by decedent's doctor. She read it and asked if he wanted her to give the decedent 30 milligrams of Ansolysen, to which the answer was, "Yes."

The nurse thereupon prepared a needle containing 30 milligrams of Ansolysen and went to the decedent's room. Both the decedent and his wife, who was present at the time, protested that the doctor had said the decedent was to receive no more injections. The nurse thereupon reread the Order Sheet and returned to the decedent's room insisting that the injection be given. Reluctantly, the decedent permitted the nurse to inject the drug. The nurse then told the decedent he was to receive another injection the next day and when the decedent stated he would not take any more injections, she called his doctor. Thereupon, the nurse learned for the first time that the 30 milligrams of Ansolysen should have been administered orally.

Upon learning of the nurse's error, the doctor ordered certain precautionary steps taken and returned at once from his home to the hospital. These precautions consisted of special duty nurses to take and record the decedent's blood pressure every fifteen minutes; the removal of shock blocks used to reduce blood pressure from the decedent's bed, and intravenous injections of glucose. These precautions were continued for only thirty-six hours. After the erroneous injection the decedent complained of violent headaches and loss of vision. He was patently disturbed.

As a result of the measures taken, the decedent suffered no major effects from the excessive injection of Ansolysen. He was subjected to physical inconvenience and discomfort by the injection of glucose intravenously through the medium of a large and painful needle inserted in the vein of one of his arms which, for the purpose, had been immobilized.

As a result of the erroneous injection, the decedent was forced to remain in the hospital as a bed patient longer than would otherwise have been required, with a consequent delay in his return to his home. He, in fact, returned to his home on October 17, remained there until October 26, when he was returned to the hospital where he died on October 30.

The excessive injection of Ansolysen did not hasten the decedent's death, but it is contended, and there is evidence in the record in support, that prior to the erroneous overdose of Ansolysen the decedent was pleasant, happy and optimistic, but that, afterward, he lost his optimism and became depressed and melancholy. He thereafter degenerated physically, morally and spiritually until his death. He appeared to give up all hope for himself after the overdose.

The complaint filed below alleged two causes of action, each of which was based upon the hospital's negligence. The first was an action for the pain and suffering of the decedent which survived to his estate under 10 *Del. C.* § 3701. The

second was an action brought by his widow for wrongful death under 10 *Del. C.* § 3704(b). Prior to trial, the action for wrongful death was abandoned.

At the trial the defendant moved for a directed verdict prior to the jury's verdict. This was denied. The jury returned a verdict of $30,000.00 for the plaintiff. The defendant then moved again for a directed verdict, or, in the alternative, for a new trial. A new trial was granted on the issue of damages alone on the ground that the verdict was excessive. By appeal and cross-appeal we have before us the propriety of all the terms of the trial judge's order.

The cross-appellant, the defendant hospital, attacks the denial of its motion for judgment or for a new trial on the issue of liability on the following grounds, *viz.*:

(1) That the burden cast upon plaintiff required her to present expert testimony in support of the allegations of negligence on the part of the hospital, which plaintiff failed to do;

(2) That plaintiff is not entitled to recover for decedent's pain and suffering since decedent suffered no actionable physical injury.

The appellant, decedent's administratrix, attacks the award of a new trial upon the issue of damages on the ground that the award of a new trial on this issue by the trial court was an abuse of discretion.

We take up first the two questions presented by the cross-appellant.

The hospital argues on the first question that the issue for the jury was whether or not a registered nurse, employed by the hospital, had exercised reasonable care in administering an ordered drug. The answering of this question involved the determination of whether or not the nurse's conduct met the applicable standard of care required of the nursing pro-

fession under the circumstances. It is argued that such standard of care must be established by expert testimony and that, since plaintiff failed to produce any such proof of the required standard, she, by reason of that, had failed to prove negligence.

In *Christian v. Wilmington General Hospital,* 11 *Terry* 550, 135 *A.* 2d 727, we held that when recovery in tort is sought to be made from a doctor by reason of faulty medical care, it is incumbent upon the plaintiff in almost all cases to prove by competent expert testimony the medical standards to which the doctor must conform and by which his treatment is to be judged. The reason for the rule was stated to be that ordinarily a layman could not be expected to know the appropriate standards of care to be followed. This rule later was at least impliedly approved by us in *Wilmington General Hospital v. Manlove, Del.,* 174 *A.* 2d 135. By reason of the *Manlove case,* and *Mitchell v. Atkins,* 6 *W. W. Harr.* 451, 178 *A.* 593, it would appear that the rule is equally applicable to the nursing profession as well as the medical. See, also, *Annotation,* 51 *A. L. R.* 2d 970.

But the rule does not intend to embrace all the acts of doctors and nurses so as to require a plaintiff to produce expert testimony to the effect that the standards of a particular healing profession require the practitioner to do that which any reasonable, even though untrained, person would do in the exercise of common sense. In *Wigmore on Evidence* (3rd Ed.), § 559, the author suggests a guide for the determination of whether or not expert testimony is required to establish the standards governing professional conduct. That suggestion is that such testimony is required only when the circumstances of the case would make it presumptuous for a person of only ordinary experience to assume to trust his senses for the purposes of his own actions.

In the case at bar, the nurse had but to read all the physician's instructions appearing on the Order Sheet

in order to avoid the mistake she made. It appears in the record by expert testimony that the very purpose of the Order Sheet is to guide the nurses in carrying out the doctor's orders. This being so, we think the calling of an expert witness to testify that the failure of a nurse to follow the doctor's written instructions was a violation of the expected standards of her profession, would be an empty gesture.

The real question to be resolved in this case is whether or not the nurse should have gone back on the Order Sheet to learn what had transpired during her leave. Had she done so, she would have avoided the error she made. She had not only one but two opportunities to do so. Her duty to go back must also be decided in the light of the fact that the last entry on the Order Sheet said nothing concerning the method of administering a dose of an unusual size to be injected by needle. The nurse, herself, was aware of this and, yet, knowing that she knew nothing of what had been ordered for the patient for the preceding three days, she went on the assumption that nothing had been changed. We think the jury could judge her conduct without the assistance of expert testimony.

Furthermore, at the trial the head nurse of the defendant hospital was quoted as stating she did not know how the mistake had happened. The decedent's doctor is alleged to have said that the nurse had made a bad mistake. The decedent's doctor entered in his notes on the night of the day the injection was given that it had been given in error, and that no satisfactory explanation had been given. This is expert testimony of some character. However, we think the particular issue did not require the establishment of standards by experts. The question was one to be decided by the application of ordinary common sense. There is no error in the record in this respect.

The second question raised by the cross-appellant is that no recovery for pain and suffering may be had because the decedent suffered no actionable impact which caused the pain

and suffering. In support of the argument is cited 25 *C. J. S. Damages* § 63; 52 *Am. Jur., Torts*, § 45, and *Boyle v. Chandler*, 3 *W. W. Harr.* 323, 138 *A.* 273, for the proposition that, absent a physical impact, recovery may not be had for mental anguish, pain and suffering absent willful or wanton negligence, or malicious intention to cause mental distress on the part of the defendant.

We do not reach the question and, hence, express no opinion upon the soundness of the proposed rule. We note, however, that the requirement of a physical impact as a foundation for the recovery of so-called parasotic injuries is criticized by modern writers. See *Prosser on Torts* (2nd Ed.), § 37; 2 *Harper and James, Law of Torts*, 1033-1034, and *Goodrich, Emotional Disturbance as Legal Damage*, 20 *Mich. L. Rev.* 497.

We do not reach the question because the pain and suffering of the decedent was the direct result of the injection by needle of an overdose of Ansolysen. To be sure, it is argued that the injection was administered with the consent of decedent. This grudging consent, however, was given only after strenuous objection by both the decedent and his wife, and only after reassurrance by the nurse that she had again checked the doctor's orders that it be given. Such consent as was given was only to a proper dose ordered by his doctor. As a matter of fact, it was a highly improper dosage and in flat opposition to the doctor's orders which, as we have pointed out, the nurse should have known. Under such circumstances, the decedent must be held not to have consented to this improper administration of the drug. *Restatement of Torts*, § 55.

It follows that there is no error in this record of this character.

Finally, the appellant administratrix argues that the trial judge committed error in setting aside the jury's verdict and ordering a new trial upon the issue of damages.

The ground upon which a new trial was granted was that the verdict was excessive under the evidence. This has long been a ground for the granting of a new trial by the Superior Court in the exercise of its discretion. *Benson v. Mayor & Council of Wilmington*, 9 *Houst.* 359, 32 *A.* 1047; *Shea v. Kerr*, 1 *Penn.* 198, 40 *A.* 241; *Winkler v. Philadelphia & R. Ry. Co.*, 4 *Penn.* 80, 53 *A.* 90, and 1 *Woolley on Delaware Practice*, § 736.

■ Equally well settled in our law is the proposition that, except for the abuse of its discretion by the trial court, an order either granting or denying a new trial is not appealable. *Philadelphia B. & W. Ry. Co. v. Gatta*, 4 *Boyce* 38, 85 *A.* 721, 47 *L. R. A., N. S.*, 932 and *Trowell v. Diamond Supply Co.*, 8 *Terry* 422, 91 *A.* 2d 797. It follows, therefore, that our function of review is to determine whether or not the act of the trial judge in setting aside this verdict was an abuse of judicial discretion.

■■ In reviewing the discretionary acts of trial courts, an appellate court will ordinarily not reverse if the trial court has acted in good faith, and as the result of sound and deliberate judgment. The ruling will not be disturbed unless it clearly appears that it was made on grounds or for reasons clearly untenable, or clearly unreasonable. The question is always not what another would have done under the circumstances, but whether there is reasonable grounds for having done what was done. *Bringhurst v. Harkins*, 2 *W. W. Harr.* 324, 122 *A.* 783.

In *Pitts and Coker v. White*, 10 *Terry* 78, 109 *A.* 2d 786, we had occasion to attempt a definition of judicial discretion. Necessarily, that definition cannot be precise because of the very nature of the exercise of discretion. Men may reasonably differ as to what is proper discretion under the same circumstances, but a reviewing court may not substitute its own notions of discretion for those of the trial judge when his judgment is based upon conscience and reason, as opposed to capriciousness or arbitrariness.

We have carefully considered the record before us and the opinion of the trial judge setting aside the verdict on the ground that the amount was excessive. The reasons advanced by the trial judge briefly were that the proof as to damages consisted primarily in the testimony of the plaintiff and the decedent's friends and relatives that after the overdose the decedent appeared to change from a pleasant and optimistic man to a despondent one without hope. As opposed to this was the testimony of the doctor that, in his opinion, the attitude of the decedent had not changed. He testified that the decedent had, throughout, been troubled by his illness, but had concealed this attitude from his wife. Certain it is that the physical results of the overdose upon the decedent were of a temporary nature. The claim for damages is based therefore almost entirely upon a personality change in the decedent following the overdose. It is not unreasonable to suppose that this change might be explained as having been caused by the decedent's realization that the last desperate hope to arrest his fatal disease had come to naught.

The trial judge was of the opinion that $30,000.00 was so grossly disproportionate to the injuries shown as to indicate either that the jury mistook the nature of the action (that is, believed it to be one for wrongful death), or that it resulted from passion, prejudice, whim, or caprice. He heard the witnesses from the witness box, and he is vested with a large discretion in granting or denying new trials. *Bringhurst v. Harkins, supra.* There is nothing in this record which demonstrates that his judgment was patently unreasonable. We therefore must perforce refuse to disturb his ruling.

The judgment below is affirmed.