367 A.2d 999 (1976)
Seymour SEILER, Defendant below, Appellant,
v.
LEVITZ FURNITURE COMPANY OF the EASTERN REGION, INC., Plaintiff below, Appellee, and
Wilmington Shopping Center, Inc., et al., Defendants below, Appellees.
WILMINGTON SHOPPING CENTER, INC., et al., Defendants below, Appellants,
v.
LEVITZ FURNITURE COMPANY OF the EASTERN REGION, INC., Plaintiff below, Appellee, and
Seymour Seiler, Defendant below, Appellant.
Supreme Court of Delaware.
Submitted March 12, 1976.
Decided November 24, 1976.
Reargument Submitted December 3 and 9, 1976.
Decided December 27, 1976.
*1001 James M. Tunnell, Jr., William H. Sudell, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, and David Snellenburg, II, Wilmington, for Seymour Seiler.
Bruce M. Stargatt and Richard H. May, of Young, Conaway, Stargatt & Taylor, Wilmington, for Levitz Furniture Co. of the Eastern Region, Inc.
F. Alton Tybout, of Tybout & Redfearn, Wilmington, for Wilmington Shopping Center, Inc., and A.A.R. Realty Corp.
William D. Bailey, Jr., and Alan T. Boyd, of Bayard, Brill & Handelman, Wilmington, for A. A. Rosen, Miriam Rosen, Jerry Bauman and Selma Bauman and A. A.R. Realty Corp.
Before DUFFY and McNEILLY, Justices, and BROWN, Vice Chancellor.
*1000 DUFFY, Justice:
This is an action by Levitz Furniture Company of the Eastern Region, Inc. (Levitz) to recover for damages to its Tri-State Mall store resulting from two floods in 1970 and 1971, respectively.[1] Levitz also seeks damages for alleged defects in the air conditioning and electrical systems and in the flooring. Defendants are Wilmington Shopping Center, Inc. (Wilmington Shopping) and its successor in interest, A.A.R. Realty Corp. (AAR), developers and owners of the Mall,[2] Seymour Seiler, an architect-engineer who designed the Levitz building; and four individuals (A. A. Rosen and Miriam Rosen, his wife, and Jerry Bauman and his wife, Selma Bauman) who personally guaranteed obligations owed by AAR to Levitz.
After a ten-week trial, the Superior Court filed a comprehensive opinion with detailed findings and conclusions; it determined that all defendants were liable to plaintiff for damages caused by the flooding, but reserved for later determination the amount thereof as well as cross claims among defendants.[3] The Court also entered judgment in favor of Levitz against Seiler for deficiencies in the air conditioning and electrical systems but concluded that plaintiff had failed to prove its claim for defects in the flooring.
We consider appeals by all defendants.

I
The Levitz furniture store is a two-level building consisting of a combined showroom-warehouse located at the southeast corner of the Mall and bordered on the east by Naamans Creek. It was constructed by AAR pursuant to a Lease Agreement between Wilmington Shopping and Levitz, and in accordance with plans and specifications prepared by Seiler. Article XVI of the pre-construction agreement, which required the Landlord to construct a building in accordance with the Seiler plans, provided:
"OWNER shall not be liable for any damage to property of TENANT or of others located on the LEASED PREMISES *1002 nor for the loss of or damage to any property of TENANT or of others by theft or otherwise, OWNER shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain, or snow or leaks from any part of the LEASED PREMISES or from the pipes, appliances, or plumbing works or from the roof, street, or subsurface or from any other place or by dampness or by any other cause of whatsoever nature. OWNER shall not be liable for any such damage caused by other tenants or persons in the LEASED PREMISES, occupants of adjacent property, of the SHOPPING CENTER, or the public, or caused by operations in construction of any private, public, or quasi-public work. OWNER shall not be liable for any latent defect in the LEASED PREMISES or in the building of which they form a part except for a period of one (1) year from the date TENANT takes possession of the LEASED PREMISES. All property of TENANT kept or stored on the LEASED PREMISES shall be so kept or stored at the risk of TENANT only and TENANT shall hold OWNER harmless from any claims arising out of damage to the same, including subrogation claims by TENANT'S insurance carriers unless such damage shall be caused by the willful act or gross neglect of OWNER."
Amendment A to the Lease, executed on August 2, 1968 at the insistence of AAR's mortgagee, Mutual of New York (MONY), struck from Article XVI the phrase "unless such damage shall be caused by the willful act or gross neglect of OWNER."
Construction began in September 1968. By the following February it had become apparent that there were a number of problems with the project, including seepage and leakage into the basement and a "tilt" or lean in the west wall of the basement toward Naamans Creek. On March 5, 1969 Levitz engaged the engineering firm of Sanders and Thomas to determine the safety of the building. In a written report to Levitz, Sanders and Thomas described the tilting wall condition and concluded that the building was unsuitable for the intended function of furniture storage and display. In a subsequent investigation-and report, the engineering firm noted a water problem at the building and questioned its structural adequacy to safely support the floor and roof. Although Levitz originally sought damages on account of the tilting wall, it later withdrew that claim.
At trial Leon Levitz, President of the Levitz Company, testified that he became concerned about the structural integrity of the building and instructed the Company's attorney to obtain guarantees from the Owner that would protect Levitz from loss resulting from structural defects. The result was a "personal" agreement between Levitz and AAR which was executed on April 30, 1969 (the April 30 Agreement) and provided, in part, that if any structural portion of the building was defective and caused injury to Levitz (including injury to "any personal property of LEVITZ located on the demised premises"), the Owner would compensate Levitz for such injury.[4]
*1003 The Trial Court found that AAR did not want MONY to have an opportunity to terminate the mortgage commitment and, for that reason, the April 30 Agreement was not executed as an amendment to the Lease, but was made as an "agreement personal to the parties," namely, Levitz and AAR. On April 25, 1969, the parties had made an agreement in which the individual defendants personally guaranteed to Levitz full performance of the April 30 Agreement during the term of the lease and any renewals thereof.
Subsequently, Levitz and AAR executed another agreement, dated June 13, 1969, again "personal to the parties" and again prompted by the water problem.[5] The purpose of that agreement was to compensate Levitz for any adverse effect which the water condition might have on its use of the basement during the first year of operation; it also provided for future rental diminution if the problem continued after that period.
The Levitz store opened for business in June 1969. The first of the two major floods in question occurred on August 1, 1970, when water entered the basement to a height between eighteen and twenty-four inches and damaged furniture stored below that level. Levitz rented outside warehousing and held a flood sale. The Company did not resume use of the basement warehouse until March 1971.
Meanwhile, in December 1970 construction of a dike to eliminate the flooding problem had begun along the west bank of Naamans Creek. Trial testimony was conflicting as to who was responsible for design of the dike. Seiler prepared the initial plans but his design was not adopted by the Owner, apparently because it was unwilling to spend the money required to execute it. However, AAR did eventually *1004 undertake to erect, without formal plans, a "boulder dike" which did not conform to Seiler's plan.
After completion of the boulder dike, AAR requested Seiler to certify to MONY that the Mall had been completed in accordance with plans and specifications. Seiler's response was that a number of items remained to be completed, including the dike. In June 1971 (some three months after Levitz had again begun use of the basement for furniture storage), dirt fill was placed among the boulders, and on June 28 of that year Seiler certified that the Mall was substantially complete in accordance with his plans and specifications.
By August 28, 1971 it became apparent that the dike was not successful in stopping water from entering the Levitz basement. On that date water flowed into the basement to a height of about one foot. There was no furniture damage because Levitz had converted to a two-tier system of storage in which the lower tier was about four feet above the floor, a precautionary measure taken as a result of the first flood; but, of course, the flood made the basement unusable.
On September 13, 1971, before Levitz had decided whether to again occupy the basement, flood waters returned, this time to a level of six feet, nine and three-quarter inches, thereby rendering unsalable all items stored on the lower tier and seventy-five percent of those stored above. On July 6, 1972 an engineering firm was retained by AAR to suggest a solution to the flooding problem. After AAR refused to adopt the measures recommended, Levitz, with AAR's authorization, caused the recommendations to be implemented, including a removal of loading dock doors from the east side to the north side of the building; a waterproof wall was built in front of the receiving doors.
The non-flood related claims included an alleged inability of the air conditioning system to adequately cool the building, defects in the electrical system and deterioration of the floors. Levitz corrected the defects and sought to recover the costs which it had incurred.

II
A threshold and critical issue in this appeal concerns the April 30 Agreement. Defendants say that the recitation contained in the Agreement that it "is not an amendment or addition to the ... Lease Agreement" was inserted solely to avoid giving MONY an opportunity to cancel the mortgage. They say that the original intention was to amend the Lease, that Levitz always treated it as an amendment and that, taken in part or in whole, the Agreement does amend the Lease, Levitz' position is that the April 30 Agreement was personal to the parties and independent of the Lease.
As we have noted, the April 30 Agreement provided for compensation to Levitz by AAR for any damage sustained because of defects in the structural portion of the building required to be maintained by AAR. Because of the exculpatory provisions in Article XVI of the Lease, quoted above, Levitz relies exclusively on the terms of the April 30 Agreement.
We have observed that paragraph 4 of the April 30 Agreement expressly states that it is not an amendment but is personal to the parties. But paragraph 3 of that same Agreement specifically amends Article XIX of the Lease and the first two paragraphs thereof require payments by the Owner under terms which are inconsistent with the Lease. It is this apparent contradiction which is at the heart of the dispute and fundamental to its judicial resolution.
On this state of affairs the Trial Judge determined that, under all circumstances, the April 30 Agreement was not an amendment to the Lease, that it was, rather, a binding separate agreement enforceable on its own terms.
*1005 The April 30 Agreement must be considered in the context of the on-going relationship of the parties. They made that agreement in their mutual interest to resolve problems which arose during construction. For their own reasons the parties deemed it to be to their common advantage to settle those problems without affecting the agreement which involved the third party mortgagee, viz. MONY. While an agreement independent of the Lease could not affect MONY's rights without its consent, that is not the problem posed by this lawsuit. MONY's rights, for present purposes, remain as before. Our inquiry concerns Levitz vis-a-vis AAR and those identified with it.
We are unaware of any reason in law why Levitz, on the one side, and AAR, on the other, could not make what counsel has aptly called a "two-tier agreement"[6] which in no way involves fraud or unfairness to the rights of third parties. The Trial Judge found that it was the intention of the parties to create such an agreement and that they did so. Indeed, in light of the exculpatory clauses in the Lease, any other result would contravene what we regard as the obvious intent of the parties, that is, to hold AAR liable to Levitz for defects in the structural portion of the premises to be maintained by the Owner.
While many more comments might be made about the conclusion by the Trial Judge, the short of it is that, when all is said and done, we find no reason to disagree with his determination. The language of the Agreement is plain, its meaning is clear and thus the Court's duty is to apply it, not to remake it. Cf. Conner v. Phoenix Steel Corp., Del.Supr., 249 A.2d 866 (1969); Jefferson Chemical Co. v. Mobay Chemical Co., Del.Ch., 267 A.2d 635 (1970). And to the extent the Trial Court's determination rests on facts, there is evidence to support them and, therefore, we affirm the ruling, Levitt v. Bouvier, Del.Supr., 287 A.2d 671 (1972).
Defendants argue, with some vigor, that the recitation as to the "personal" nature of the April 30 Agreement was solely to avoid giving MONY the opportunity to cancel its mortgage commitment and, except for that consideration, the parties intended to amend the Lease. The critical issue, of course, does not concern "amendment" as an academic issue. The legal label is unimportant. What is important is whether the April 30 Agreement is to be enforced in accordance with its own terms, or whether it is to be read in light of the exculpatory terms of the Lease. No matter the form in which the question is stated, that is the substantive issue.
We have no doubt that the parties intended to be bound by what is written in the April 30 Agreement. No other conclusion is reasonably possible from the plain words which they used to state their commitment to each other.

III
Defendants next argue that even if the April 30 Agreement is regarded as independent of the Lease, its scope is limited to the tilting-wall problem which developed during construction.
The Agreement provides for liability on AAR by identical language in two separate paragraphs, thus: "if any structural portion of the ... premises required to be maintained by OWNER are [sic] defective...." (emphasis added). Clearly, the Agreement does not, in so many words, limit liability to the tilting wall  as it might have done. Defendants say that the June 13 Agreement, which was executed in the same manner, provided specifically for a "water and moisture condition" in the basement and, therefore, the April 30 Agreement should not be construed to provide liability for such a condition, i. e., flooding. Levitz argues, and the Trial Court agreed, that the April 30 Agreement is unambiguous and thus not subject to interpretation by the Court.
*1006 We agree with that conclusion. Again, the language used by the parties is clear and unambiguous and, therefore, judicial construction is not required: it specifies defects in any structural portion of the building to be maintained by AAR. In the face of such clarity, the Court certainly cannot change language of the Agreement, nor may it ignore that language. Conner v. Phoenix Steel Corp. supra; Jefferson Chemical Co. v. Mobay Chemical Co., supra; Laird v. Employers Liability Assur. Corp., Del.Super., 2 Terry 216, 41 Del. 216, 18 A.2d 861 (1941); 17A C.J.S. Contracts § 294b(1), § 296(2). In brief, the parties did not limit the scope of the Agreement to the tilting wall and the Court cannot do so now.
While the rule of non-ambiguity governs the scope of the clause relating to any structural defect, we note that the Trial Court admitted and considered "background facts" as to the circumstances which led to execution of the April 30 Agreement. The evidence was in conflict as to whether the parties intended to contract only as to the tilting wall, as AAR contends, or whether they intended to provide for "any defect," as Levitz argues. The Court was not persuaded that such facts showed that the parties intended to contract only as to problems arising from the wall. Given the conflict in evidence, including the live testimony, we conclude that the Trial Court's determination is within the rule of Levitt v. Bouvier and we will not disturb it. And, as this Court observed in Gammel v. Candler-Hill Corp., Del.Supr., 34 Del.Ch. 297, 304, 103 A.2d 228, 232 (1954), responding to an argument similar to that made here by AAR:
"But even if the inference [argued by AAR] were a proper one, it is still only one among a multitude of conflicting factual considerations which the Chancellor was forced to evaluate. Such a mere inference is not to be confused with a consideration having conclusive force."
Finally, as to the April 30 Agreement, AAR says that it specifically refers to portions of the building (roof, outerwalls, gutters, for example) to be maintained by the Owner and liability for an error in design or placement is not included within such specifics. In a nutshell, AAR claims that errors of design and placement do not constitute "structural defects" as contemplated by the Agreement.
While there does seem to be some conflict in the cases as to whether a design defect is a defect in structure, we agree with the rule announced in Swern & Company v. Morrisville Shopping Center, Inc., 429 Pa. 204, 208, 239 A.2d 302, 304 (1968):
"In any case, a far more reasonable interpretation of `faulty construction' or `structural defect' would include faulty design. The defect inheres in the structure, and results from the construction, whether it originated in the architect's blueprint or the builder's failure to follow that blueprint."
We hold that under the facts of this case an error in establishing proper elevation of the building is a structural defect within the meaning of the contract.

IV
We turn now to the contentions made by the architect-engineer Seiler whom the Trial Court found to be liable to Levitz for its damages resulting from both the first and second floods.
Seiler argues, inter alia, that he was not in privity with Levitz, that the alleged defects were patent and that expert testimony was required to establish the standard of care to which he was bound.[7]

*1007 A.
First, as to privity, the case against Seiler was tried on a negligence basis (not on a contract theory) and, to the extent he relies on the absence of privity in product liability cases, the argument is without merit in light of our recent decision in Martin v. Ryder Truck Rental, Inc., Del.Supr., 353 A.2d 581 (1976). Compare 65 C.J.S. Negligence § 4(11). In any event, Seiler is accountable to Levitz under third-party beneficiary principles. Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc., Del.Supr., 336 A.2d 211, 215 (1975). Clearly, the intention of the parties was that Seiler satisfy AAR's obligation under the Lease to provide a building constructed in accordance with his own plans and specifications.
For these reasons, we conclude that neither the absence of privity nor the other contentions made by Seiler on this issue are meritorious, and we affirm the Trial Court's conclusion that Levitz has a cause of action against Seiler.

B.
Seiler next argues that he cannot be held liable for the alleged defects because they were patent and an architect's liability is limited to damage caused by a latent defect. It is our understanding that he did not argue this in the Superior Court. In this very complex fact case we decline to consider the argument in an appeal context without prior findings of fact and a determination by the Trial Judge. For present purposes, however, we regard the Trial Judge's finding that Levitz was not contributorily negligent as including a consideration of whether or not the elevation defect was so obvious that additional action by Levitz was required. And that ends the necessity for any further review of the issue in this appeal.

C.
In essence, the claim by Levitz against Seiler alleges malpractice in his professional work as architect-engineer. Put quite simply, he is charged with failing to perform as a reasonably prudent architect-engineer would have performed under comparable circumstances. As stated by the Trial Court, the question is, did Seiler conform "to the architectural and engineering standards of skill, care and competence with are adhered to by architects and engineers who are in good standing in the community?"
In Delaware, the standard of care applicable to professional persons providing personal service has been litigated largely in the field of medical malpractice. With regard to physicians and surgeons the standard of care has been fairly well defined. See, for example, Christian v. Wilmington General Hospital Ass'n, Del. Supr., 11 Terry 550, 50 Del. 550, 135 A.2d 727 (1957); DiFilippo v. Preston, Del. Supr., 3 Storey 539, 53 Del. 539, 173 A.2d 333 (1961). Apparently, there is not a reported Delaware decision discussing the standard of care to be exercised by architects and/or engineers. However, since the professional responsibility of an architect or engineer does not differ in principle from that of a physician (or an attorney), Bayne v. Everham, 197 Mich. 181, 163 N. W. 1002 (1917), in our view, the same standard of care should apply.
In Bloomsburg Mills, Inc. v. Sordoni Construction Co., 401 Pa. 358, 361, 164 A.2d 201, 203 (1960), the Pennsylvania Supreme Court summarized the legal responsibility of an architect in language which we find appropriate for Delaware:
"An architect is bound to perform with reasonable care the duties for which he contracts. His client has the right to regard him as skilled in the science of the construction of buildings, and to expect that he will use reasonable and ordinary care and diligence in the application of his professional knowledge to accomplish the purpose for which he is retained. While he does not guarantee *1008 a perfect plan or a satisfactory result, he does by his contract imply that he enjoys ordinary skill and ability in his profession and that he will exercise these attributes without neglect and with a certain exactness of performance to effectuate work properly done."
See also 6 C.J.S. Architects § 27; 65 C.J.S. Negligence § 95c.
Seiler tacitly agrees with this standard of care but, relying on such cases as DiFilippo v. Preston, supra; Peters v. Gelb, Del.Super., 303 A.2d 685 (1973); Covil v. Robert & Company Associates, 112 Ga. App. 163, 144 S.E.2d 450 (1965); Paxton v. County of Alameda, 119 Cal.App.2d 393, 259 P.2d 934 (1953), he argues that this standard of care could only be established through expert testimony and that the record below is totally devoid of such evidence.
As a general rule the standard of care applicable to a professional can only be established by way of expert testimony. See Christian, supra. However,
"... if a layman is as competent as an expert to judge whether or not a particular design created an unusual risk, evidence by experts is inadmissible because their proof that the defendant followed standard practice would not necessarily show he was not negligent." Comment, Architect Tort Liability In Preparation of Plans and Specifications, 55 Cal.L.Rev. 1361, 1364 (1967) (citations omitted).
That exception is consistent with the law of this State. Larrimore v. Homeopathic Hospital Ass'n of Del., Del.Supr., 4 Storey 449, 54 Del. 449, 181 A.2d 573 (1962).
Noting the opinion of this Court in Larrimore, the Trial Judge concluded that Seiler's mistake was so apparent that plaintiff was not obliged to produce expert testimony at trial to establish the bench mark by which his standard of care is measured. We agree.
In the final analysis Seiler, by his own testimony, admitted that an investigation as to the possibility of flooding was necessary; he went on to say that he had investigated that possibility. The crux of the Superior Court decision is that in such investigation Seiler was "put on notice" that flood waters had topped Naamans Road on previous occasions and that he failed to design the warehouse accordingly. In his Opinion the Trial Judge stated:
"Seiler testified that he would have either raised the elevation of the building or made the walls water-tight had he known that flood waters had topped Naamans Road, which had an elevation of thirty-three feet. As indicated, however, it is my opinion that there was ample information to this effect which was available to Seiler. Stephen Kowalchuk, the County official who ultimately approved Seiler's grading and drainage plans, testified that he had advised Seiler of the fact that inasmuch as flood waters had topped Naamans Road by two feet in August, 1967, the elevation of the building should be at least equal to the elevation of the surface of Naamans Road at the creek, or, thirty-three feet."
In a footnote, the Court added:
"Without regard to the soundness of Kowalchuk's advice that the elevation of the building be at least thirty-three feet notwithstanding the fact that flood waters had reached a height of thirty-five feet, it is clear that this information should have put Seiler on notice that flood waters had recently topped Naamans Road and that he should design the elevation of the building accordingly.
It might also be noted that negligence, if any, on the part of government officials in dealing with Seiler (whether through giving advice or approving his plans) would not wipe out Seiler's obligation as a professional to determine the various data for himself and to bear the responsibility for his determinations."
*1009 There is evidence to support the conclusion that Seiler knew or should have known of the flooding potential of the area and in accordance with settled law, we affirm it.[8]

V
AAR and the individual guarantors argue also that the Trial Court erred as a matter of law in determining that breach of the April 30 Agreement was the cause of Levitz' damages resulting from the second flood in September 1971. They contend, as we understand the briefs, that at the time of the flood the Building Code of New Castle County required protective provisions against storms with a frequency of once in a hundred years and that, according to the undisputed evidence, the second storm was one which occurred only in excess of once in a hundred years. The storm was, say defendants, an act of God or an unavoidable accident for which they are not liable under either tort or contract law.
The Trial Court determined, and we have affirmed, that AAR's liability to Levitz for flood-related damage flowed from the April 30 Agreement. From the evidence the Court implicitly concluded that defendants' duty under the Agreement was to comply with the protective provisions of the County Code, which required protection against a "hundred year flood"; there was evidence to show that defendants failed to provide such protection after the first flood and that the second flood was "a storm of 100 year frequency."[9] Under these circumstances the Trial Judge's findings were supported by the evidence and his conclusion of law that breach of the April 30 Agreement caused the September 1971 flood damage was correct.
As to Seiler, who also argues that he cannot be held liable for the second flood, the Trial Judge's finding that the dike erected after the first flood did not contribute to or enhance the possibility of second flooding is determinative. We make no judgment about any cross claim Seiler may have against the other defendants arising out of the second flood.

VI
Finally, we affirm the Trial Court's conclusion that defendants are liable to Levitz for certain non-flood related claims. The Court found that the air conditioning system was inadequate to cool the building in accordance with the specifications and, in addition, that Seiler was liable for the cost of certain electrical repairs because he had mistakenly certified that the electrical work had been completed in accordance with his design.
*1010 In our view, Seiler's obligation to Levitz for defects in the air-conditioning system is more properly based upon third-party beneficiary principles than upon tort, see Cannon v. Dorr-Oliver supra, but the result is the same. And there is evidence to support the Court's rulings.
We find no error.
Other arguments made by defendants have been considered and found to be without merit.
Affirmed.
Before DUFFY and McNEILLY, Justices, and BROWN, Vice Chancellor.
Upon motions for reargument.
Seiler has moved for reargument on the ground that:
"[T]he summary affirmance by this Court of the [T]rial [C]ourt's finding of Seiler's liability for damages resulting from the second flood imposes on architects by implication a rule of indefinitely continuing liability for a completed act of negligence, that such a standard of liability is inconsistent with established principles of tort law, and that, if such a standard is to be the law of Delaware, it should be imposed expressly, and not just by implication."
In view of the limited discussion of this question by the Trial Court, we conclude that further consideration of the issue is desirable. We think, however, this should be initially examined by the Trial Court as it considers damages, and the proximate cause issue related thereto, and the cross claims. Accordingly, remand will be ordered for this purpose and, to that extent, this Court's Opinion dated November 24 is modified. In all other respects, Seiler's motion for reargument will be denied.
AAR has moved for reargument on the question of the relationship of the April 30 Agreement to the basic lease. AAR identifies a number of issues and questions centered around the extent to which the basic lease survives.
We have approved the Trial Judge's determination that the April 30 Agreement was not an amendment to the lease but was a binding separate agreement enforceable on its own terms by and against the parties to it. All other questions concerning the relationship between the basic lease and the agreement are for determination by the Trial Judge after remand. AAR's motion for reargument will be denied.
AAR and the individual guarantors have moved for reargument on the proposition that the Trial Court did not enter judgment against them for damages resulting from the non-flood related claims. We agree and, accordingly the Opinion dated November 24 is modified in the following respect: The Trial Court determined that only Seiler was liable for the non-flood related claims and we affirm that ruling.
NOTES
[1] At the time the suit was begun, plaintiff was known as Levitz Furniture Company of Wilmington, Inc.
[2] Wilmington Shopping executed some of the documents but, for present purposes, we do not distinguish between it and AAR. For convenience in discussion, we sometimes refer to AAR as the signing party but, in fact, the document may have been executed by Wilmington Shopping.
[3] Since the Superior Court announced its intention to require further argument on the issues of indemnity, accord and satisfaction, it is inappropriate for us to make any comment on those claims or to rule, as Seiler urges us to do, on the effect on him of an Agreement dated April 30, 1969 between Levitz and the other defendants. Whether or not AAR's agreement to make that contract an independent undertaking with Levitz (and not an amendment of the Lease of the premises) resulted in unfairness to Seiler, is a matter for the Trial Court to consider in the first instance.
[4] In pertinent part, the April 30 Agreement provides as follows:

"1. Anything to the contrary notwithstanding in ARTICLE XIX, if any structural portion of the demised premises required to be maintained by OWNER are defective or allowed to become in a state of disrepair and because of such condition, injury occurs to any portion of the premises required to be kept in good order, condition and repair by LEVITZ, then and in such event, OWNER shall be required to make repairs not only to the structural portions, but to those portions of the premises which would otherwise be LEVITZ' obligation.
2. Anything to the contrary notwithstanding in ARTICLE XIX, if any structural portion of the demised premises required to be maintained by OWNER are defective or allowed to become in a state of disrepair and because of such condition, injury occurs to any personal property of LEVITZ located on the demised premises OWNER shall be required to pay LEVITZ for any such injury and damage sustained by LEVITZ.
3. ARTICLE XIX is hereby amended by adding at the end thereof the following paragraph:
`In the event the demised premises are rendered untenantable, in whole or in part, by reason of any structural defect or state of disrepair which [OWNER] is obligated to maintain, or if the demised premises are rendered untenantable, in whole or in part, duing any period of repairing or rebuilding as a result of any structural defect or state of disrepair, the rentals provided herein to be paid to OWNER shall be adjusted to such extent as may be fair and reasonable until the demised premises are again tenantable.'
4. This Agreement is not an amendment or addition to the above-described Lease Agreement, but is an agreement personal to the parties executing such Agreement."
[5] In pertinent part, the June 13 Agreement provided as follows:

"WHEREAS, the lower or basement storage area of the building has a water and moisture condition which may adversely affect LEVITZ' use of the premises;
NOW, THEREFORE, for and in consideration of the sum of Ten ($10.00) Dollars paid by LEVITZ to OWNER, receipt whereof is hereby acknowledged, and in consideration of the mutual covenants herein contained, it is agreed as follows:
1. Anything to the contrary notwithstanding in Article II, LEVITZ shall be given a credit of Nine Thousand Three Hundred Seventy-five ($9,375.00) Dollars to be deducted equally from the first twelve (12) monthly rental payments.
2. Anything to the contrary notwithstanding in said Lease Agreement, at the end of the first year of the Lease term, OWNER and LEVITZ shall review the water or moisture condition existing in the lower or basement storage area and should the same condition be prevalent, the parties will negotiate a fair and reasonable rental diminution for an additional period or periods.
3. This Agreement is not an amendment or addition to the above-described Lease Agreement, but is an agreement personal to the parties executing such Agreement, and is not binding on the holder of the first mortgage on the shopping center or any one claiming under him.
4. This Agreement shall not affect other claims by LEVITZ for damage against OWNER or other persons, corporations or associations arising out of the above condition."
[6] Compare Howard P. Foley Co. v. Barnett, 303 Pa. 218, 154 A. 391 (1931).
[7] Seiler argues also that he is not obliged to indemnify AAR, but we do not reach that contention because the Trial Court deferred for further argument the issues of indemnity, accord and satisfaction.
[8] We note also that Levitz offered expert testimony as to "good engineering and architectural practices with respect to flooding." George McGinley, a civil engineer with Sanders and Thomas, testified as follows:

"Q Mr. McGinley, what does good engineering and architectural practice require in connection with the anticipation of floods of streams which are adjacent to warehouse structures such as the Levitz building?
A Will you reword 
. . . . .
THE WITNESS: Well, I'll clarify by answering that any structure, not just warehouse structures, the history, past history of water in the area from any stream should be investigated, any changes in topography which may change the rainfall run-off rate should be investigated and determine where the high water mark is. Then you design your structure accordingly."
This testimony does not have the specificity as to local practice which is ordinarily given in medical malpractice cases, but it was available to the Court as part of the fact fabric in which to consider Seiler's testimony.
[9] The Engineering study by Edmund H. Richardson Associates, Inc., states:

"The runoff created by the 14 September storm was (based on available information) equivalent to or slightly greater than that which would be created by a storm of 100 year frequency."