509 So.2d 62 (1987)
MILTON J. WOMACK, INC.
v.
The HOUSE OF REPRESENTATIVES OF the STATE of Louisiana, et al.
No. 86 CA 0405.
Court of Appeal of Louisiana, First Circuit.
May 27, 1987.
Rehearing Denied July 14, 1987.
*63 Russell L. Dornier, Baton Rouge, for plaintiff-appellant Milton J. Womack, Inc.
Bert K. Robinson, Baton Rouge, for defendant-appellee The House of Representatives of the State of La.
Paul H. Spaht, Baton Rouge, for defendant-appellee Charles E. Schwing & Associates, Inc.
Before LOTTINGER, SHORTESS and CARTER, JJ.
SHORTESS, Judge.
This is a suit by Milton J. Womack, Inc., (plaintiff) against defendants the House of Representatives of the State of Louisiana (House) and Charles E. Schwing and Associates, Inc. (Schwing). Plaintiff, a general contractor, entered into an agreement with the House to renovate portions of the State Capitol building according to plans prepared by Schwing, an architectural firm. That agreement provided that plaintiff would receive a bonus for early completion. Plaintiff brought suit contending that defendants were responsible for delays which prevented it from finishing in time to earn the bonus. The trial court rejected plaintiff's demands against both defendants, and plaintiff has perfected this appeal.
Desiring to modernize some of its facilities, the House had Schwing draw up plans for the renovation of portions of the basement and subbasement of the State Capitol building.[1] The House selected plaintiff as the general contractor, agreeing to pay it $2,314,000.00 for the project. The contract between plaintiff and the House contained the following clause:

Early Completion Incentive Payment/Liquidated Damages: Because timely completion of the work is of the essence of this agreement, the following conditions are a part of this contract:
All work is to be completed by March 15, 1982. For each calendar day before March 15, 1982, that the work is complete, the Owner agrees to pay the Contractor an early completion incentive payment of $5,000.00 per day, not to exceed $100,000.00. If the contract time for the portion of the work is extended for any reason, the date for determining the early completion incentive payment will not be changed from March 15, 1982.
The House gave plaintiff permission to begin the project on July 20, 1981. The plans called for removal of an interior wall in the basement, and, as plaintiff's workers began to demolish it on or about August 8, 1981, they discovered a metal X-brace within. The brace had not appeared on any of Schwing's drawings or in its specifications. Plaintiff notified Schwing of its discovery, and Schwing concluded that the X-brace was a part of the Capitol's wind-bracing system and that it should not be removed. The X-brace was situated in an area that *64 was, in the renovation plan, designed to be an open area. Thus, defendants were called on to rethink their plans in the area of the brace.
Schwing began the redesign and submitted several options to John J. Hainkel, Jr., then Speaker of the House. Hainkel circulated these among interested House members, and eventually one of these proposals was selected. Plaintiff was given the revised plans in late September 1981, and in early October, after consultation with subcontractors and suppliers, he presented a revised price to the House. On October 14, 1981, the House, through Schwing, gave its approval to proceed with the work on that portion of the project involved in the redesign. The project was accepted as substantially complete on April 15, 1982. Because plaintiff had failed to finish by March 15, 1982, the House refused to pay the early completion bonus and plaintiff brought this suit.
The trial court found that plaintiff and the House "fully understood that in no event, would there be an extension of the early completion incentive date." It noted that both parties had an interest in early completion, that unanticipated problems are typical in renovation projects, that the House did nothing unusual to delay completion, and "that plaintiff was advised more than once, that there would be no extension." Given these factors, the court concluded that plaintiff could not recover against the House under the contract.
The trial judge's analysis of the question of Schwing's liability rested on negligence principles. "The duty of an architect is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of his profession in good standing and to use reasonable care and diligence, along with his best judgment, in the application of his skill." Despite its recognition that the original plans for the Capitol showing the X-brace were available in the State archives and that a similar X-brace had been discovered earlier during work on the Senate portion of the basement, the court ruled that Schwing's actions did not fall below the acceptable standard and thus that it was not negligent.
Plaintiff assigns three errors on appeal:
1. The trial court erred in limiting its review to the "early completion incentive" clause in determining the right of plaintiff-appellant to recover under the contract.
2. The trial court erred in finding that the Owner did not take any action out of the ordinary to delay completion of the job.
3. The trial court erred in finding that the Architect was not liable for preparation of the "defective plans."
Plaintiff's asserted errors allege both contract and negligence as grounds for recovery. We will begin with a consideration of the negligence argument.

LIABILITY OF SCHWING
Schwing's specifications indicated the location of all the structural elements that Schwing was aware of. Its architects' knowledge of the building's structure was derived from original framing plans found in the archives. The architects believed that the wall containing the wind brace concealed no structural elements, and their plans reflected that belief. When the wall was demolished, a large committee room was to be created, with, except for structural columns, a clear view from rear to front. Had the architects known of the X-brace, they would not have chosen this configuration, for the brace significantly blocked the view of spectators behind it. Naturally, plaintiff based its bid on the plans provided by Schwing. It is undisputed that these plans were inaccurate. The initial issue to be resolved is whether Schwing's failure to discover the existence of the X-brace is actionable negligence.
Schwing cites a series of "well-settled" rules regarding the standard by which an architect's performance is to be judged. The architect's duty is not to provide perfect plans but to exercise the degree of professional care and skill customarily employed by other architects in the same general area. Calandro Development, Inc. v. R.M. Butler Contractors, *65 Inc., 249 So.2d 254 (La.App. 1st Cir.1971). The one seeking to prove negligence must establish a deviation from the standard of care and skill by expert testimony. Charles Carter & Co., Inc. v. City of Baton Rouge, 344 So.2d 431 (La.App. 1st Cir. 1977).
We accept these propositionsas far as they go. But they must be understood in the light of Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). Hastings was a medical malpractice case in which the plaintiffs alleged, inter alia, that an emergency room physician acted negligently by failing to notify the chief of surgery when the on-call physician refused to treat a wounded patient and that the on-call physician acted negligently by not obtaining more information about the patient and by not going to the hospital to examine the patient. The court made the following observations:
In some medical malpractice cases, expert testimony to establish a standard of care is unnecessary. When a physician does an obviously negligent act, such as fracturing a leg during an examination; amputating the wrong arm; carelessly dropping a knife, scalpel, or acid on a patient; or leaving a sponge in a patient's body, lay persons can infer negligence. Failure to furnish medical care to a patient with a serious head injury for a period of two hours can be judged by a common sense standard. Hammond v. Grissom, 470 So.2d 1049 (Miss.1985). Similarly, the failure of an on-call physician to respond to a hospital emergency, when he knew or should have known his presence was necessary, is obviously negligence. Thomas v. Corso, [265 Md. 84, 288 A.2d 379] supra.
Hastings, 498 So.2d at 719-720 (footnotes omitted and emphasis supplied).
Schwing cites Pittman Construction Co. v. City of New Orleans, 178 So.2d 312 (La.App. 4th Cir.), application denied, 248 La. 434, 179 So.2d 274 (1965), for the proposition that expert testimony establishing the lack of care is a sine que non of the negligence case against an architect. Pittman mentions the need for expert testimony, and its progeny incorporates the requirement. Pittman itself involved the alleged liability of an engineer for faulty plans. The following statement by the Pittman court is particularly telling in our analysis of the determination of negligence of the professional in light of Hastings:
In determining the liability of [the engineer], the same standard of care applied in the case of architects, physicians, attorneys, and others engaged in professions requiring the exercise of technical skill should be applied.
Pittman, 178 So.2d at 321.
If architects and physicians are to be judged by the same standard of care, and if expert testimony is not always required to establish the standard of care for physicians, and if "lay persons can infer negligence" by applying "a common sense standard" in the case of physicians, then an architect's negligence may on occasion be established without reference to expert testimony. See Hastings, 498 So.2d at 719-720; see also Aetna Insurance Co. v. Hellmuth, Obata, & Kassabaum, Inc., 392 F.2d 472 (8th Cir.1968) (ruling that the same principles for establishing negligence apply to such professionals as physicians and architects); W. Prosser, Law of Torts 161-162, 164-165 (1971).[2]
We find support for this reasoning in cases from foreign jurisdictions. In Aetna Insurance, the federal court ruled that expert testimony is not necessary to establish an architect's negligence when at question "are certain duties patently required of the architect that are within the common knowledge and experience of laymen serving as jurors." In Hull v. Enger Construction Co., 15 Wash.App. 511, 550 P.2d *66 692 (1976), the court endorsed the principle that where negligence is such that layment are capable of recognizing it as a departure from recognized standards, expert testimony is not needed, and it reversed in part a jury decision exonerating the defendant architects.
Seiler v. Levitz Furniture Co. of Eastern Region, Inc., 367 A.2d 999 (Del.1976), is especially instructive. In that case, an architect was sued for having designed a warehouse that flooded several times. The court noted that the same standard of care applies to both architects and physicians. And with the following language it found that testimony from an architectural expert was unnecessary:
The trial judge concluded that [the architect's] mistake was so apparent that plaintiff was not obliged to produce expert testimony at trial to establish the bench mark by which his standard of care is measured. We agree.
Seiler, 367 A.2d at 1008.[3]
We conclude that testimony from an expert is not always necessary to establish the negligence of an architect acting in his professional capacity. When the matter in question is one that can typically be understood without assistance from an expert, when a lay person can infer negligence, then expert testimony is not required.
We must now ask whether Schwing's failure to discover the X-bracing is the type of mistake that a layman can understand. Is it the sort of failure from which, in Hastings terms, "lay persons can infer negligence" using "a common sense standard"? We believe it is.
Ken Campbell, Schwing's vice-president, testified that he had encountered an X-brace during the work on the Senate side of the basement which preceded that on the House side. Campbell assumed that it was a structural element and "moved over to miss it." He indicated that at that time Schwing had the framing plans for the Capitol but that these plans did not show the X-brace. Schwing relied on those same framing plans when designing the renovations for the House areas.
Schwing was also aware that in the State archives were the original plans (or microfilm copies of them) for the Capitol. These plans contained a sheet which pictures the specific wall and bracing in question here and a sheet depicting the wind-bracing system for the entire building. There were approximately 500 sheets in the original plans; Charles Schwing testified that Schwing's representatives had searched the original plans to find what it needed but did not know whether they had examined all of the plans. W.J. Evans, recognized as an architectural expert, testified that he visited the archives briefly and that it would require days to locate the pertinent sheets if one did not know precisely what he was searching for. Richard Fergus, a structural engineer retained by Schwing and called by plaintiff, testified that he located the wind-bracing plans in the archives after a search of from 30 minutes to an hour.
The evidence sketched above is parallel to the facts in Seiler. There the architect had been made aware of the potential for flooding and he had actually investigated the flooding problem. Given those factors, the court found that the architect's failure to take the flooding potential into consideration when making his plans was a mistake "so apparent" that an expert witness was not necessary to a finding of negligence. In the instant case, Schwing had already discovered an X-brace in the basement. Its investigation of the original plans had yielded the framing blueprints; had its search of the plans been more careful and thorough, it would have found the sheets describing the X-brace.
We view it as a matter within the understanding of laymen that structural elements such as wind-braces are essential to the integrity of buildings, especially tall ones like the Capitol. Testimony from an *67 expert in the field of architecture is not necessary for a layman to conclude that wind bracing must be considered by one making plans for renovations, nor is expert testimony needed for a layman to conclude, under the facts of this case, that failure to discover and thus consider such an important structural element is negligence. It is "common sense" to conclude that it is the duty of an architect to use reasonable skill and care to determine the location of important structural elements before he completes his plans and authorizes work to begin in accordance with those plans. Schwing's error in failing to discover the X-brace is the sort of omission from which a layman can infer negligence. Expert testimony is not required for plaintiff to prevail on this point. Therefore, the trial court erred in finding the testimony offered by the experts in architecture dispositive of the case against Schwing.
We agree with Schwing's position that an architect is not required to produce perfect plans. He is, however, required to take reasonable steps to make his plans as accurate as reasonably possible. Schwing knew that the original blue prints were easily available; it had discovered the original framing plans; it knew that the framing plans it relied upon were inaccurate in that they failed to reveal the X-brace in the Senate portion of the basement. Richard Fergus and W.J. Evans testified that wind bracing was to be expected in the lower parts of a building such as the Capitol. Although Evans opined that a search of "days" would be necessary to find the wind bracing plans, Fergus found those plans in 30 minutes to an hour. Schwing's actions fall below the standard of care because it failed to take reasonable steps to determine the location of structural elements involved in its renovation plans.[4]
Accordingly, we hold that Schwing was negligent. It owed to plaintiff the duty to use reasonable skill and care in the preparation of plans on which plaintiff would base his bid and do his work. Schwing breached that duty. That breach caused the harm plaintiff complains of.[5] The risk and harm encountered by plaintiff fall within the scope of protection afforded by that duty. Harm to the contractor is easily associated with deviation from the rule that the architect use reasonable skill and care when preparing plans. See Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). Several courts which have considered this specific question are in accord. In Donnelly Construction Co. v. Oberg/Hunt/Gilleland, 139 Ariz. 184, 677 P.2d 1292 (1984), the Arizona Supreme Court ruled that an architect can be held liable to a contractor which suffered economic injury because of negligently prepared plans. A North Carolina court decided that despite the absence of privity a contractor can recover against an architect for economic loss caused when an architect breaches his duty of care. Davidson and Jones, Inc. v. County of New Hanover, 41 N.C.App. 661, 255 S.E.2d 580 (1979); A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla.1973); see generally Annot., 65 ALR 3d 249 (1975).

LIABILITY OF THE HOUSE
Because the House was itself not guilty of negligent conduct, to find it liable with Schwing under negligence theory, we must find that the House was vicariously liable. Vicarious liability must rest on a special relationship between Schwing and the House that justifies the imputation of negligence, e.g., a master-servant or principal-agent relationship. The architect is the agent of the owner (in this case, the House) when the architect acts as the owner's supervisor of the project; however, "an architect, as far as the preparation of plans is concerned, acts as an independent contractor." 5 Am.Jur.2d, Architects, § 6 (1962); see also Berkel and Co. Contractors, Inc. v. Providence Hospital, 454 So.2d 496 (Ala. 1984).
*68 The evidence establishes that Schwing was retained by the House and that Schwing was negligent in preparing the plans for the renovation. It is incumbent on plaintiff to prove the existence of a relationship between Schwing and the House that would allow the imputation of negligence. See Elliott v. Merritt, 457 So.2d 1216 (La.App. 1st Cir.), writ denied, 461 So.2d 315 (La.1984) and cases cited therein. The contract between the House and Schwing was not entered into evidence. There is some testimony which in general tends to show that when designing the renovations Schwing was an independent contractor. See Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972); Smith v. Zellerbach, 486 So.2d 798 (La.App. 1st Cir.), writ denied, 489 So.2d 246 (La.1986). Typically, the liability of an independent contractor cannot be imputed to the one who employs him. Plaintiff has failed to establish by a preponderance of the evidence that the House and Schwing had a relationship which would permit a finding of vicarious liability.
There remains the contention that the House is liable under the contract. The trial court was not clearly wrong in rejecting this contention with these reasons:
At the trial, the Court permitted parol evidence to explain the meaning and importance of the words cited above "extended for any reason." This evidence and other evidence in the case convinces the Court that the parties to this contract fully understood that in no event, would there be an extension of the early completion incentive date. The Owner had a great interest in having the project completed early and so did the Contractor.
We find that the House is not liable for the damages suffered by plaintiff.

DAMAGES
Plaintiff argues that the discovery of the wind bracing and resultant redesign caused delays which prevented him from receiving the $100,000.00 bonus. Jerry Householder, a civil engineer, testified by deposition that the delay ascribable to the redesign was 66 days, running from August 24, 1981, to October 29, 1981. The trial court found as fact that the bracing was discovered on or about August 8, 1981, and that plaintiff was given authorization to proceed with work on the modified design on October 14, 1981. Whichever set of dates is used, subtracting the delay from the actual date of substantial completion indicates that plaintiff would have finished the job in time to receive the entire bonus.
Defendants argue that any delays should be attributed to plaintiff because the discovery of the previously unknown X-brace did not itself cause any delay. There is no dispute that the discovery of the wind bracing necessitated a change in design. We cannot say that the trial court was clearly wrong in finding that the discovery occurred on August 8, 1981, and that plaintiff was given approval to start work on the new design on October 14, 1981. It is defendants' position that plaintiff did not do work he could have been doing during the period of the redesign and thus that plaintiff's own inaction caused it to fall behind schedule. Defendants elicited testimony that often little work was being done during the redesign while there were tasks available that were not affected by the redesign.
Plaintiff's witnesses testified that plaintiff undertook what work it could during the redesign. Charles Sonnier, plaintiff's job supervisor, indicated that he could not be reasonably sure that the redesign would not affect certain areas and therefore thought it best not to do work that later might have to be redone. He testified that plaintiff could have completed the project as first designed and bid on in time to receive the $100,000.00 bonus. Defendants presented testimony by Representative Hainkel that on one occasion when he visited the renovation site plaintiff had no one on the job. Paula Sonnier, plaintiff's project manager, produced business records that showed seven men were working on that day.
Our review of the record convinces us that had the plans originally drawn by Schwing revealed the existence of the Xbrace plaintiff would have completed the project in time to receive the early completion *69 incentive payment. We therefore set plaintiff's damages at $100,000.00.

DECREE
For the foregoing reasons, the judgment of the trial court in favor of Charles E. Schwing & Associates, Inc., is reversed, and judgment is rendered in favor of Milton J. Womack, Inc., and against Schwing in the amount of $100,000.00 plus interest from the date of judicial demand. Costs are taxed to Schwing. In all other respects the judgment below is affirmed.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] Schwing had also drawn the plans for renovations of the Senate side of the basement which began earlier than the House project.
[2] After noting that his comments about physicians apply to other professionals such as architects, Dean Prosser comments that

[w]here the matter is regarded as within the common knowledge of laymen, as where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of any expert.
Prosser at 164 (footnotes omitted).
[3] The following cases, while recognizing that expert testimony is not always required, hold that under their facts it is required: 530 East 89 Corp. v. Unger, 43 N.Y.2d 776, 402 N.Y.S.2d 382, 373 N.E.2d 276 (1977); E. Elton Thompson & Assoc., P.C. v. Williams, 164 Ga.App. 571, 298 S.E.2d 539 (1982).
[4] Charles Schwing, Ken Campbell, and Evans reiterated at trial that because Schwing was not "involved" with the structure it did not need to conduct a more extensive study to determine where structural elements were. This position begs the question. Schwing was "involved" structurally; it just failed to realize that involvement.
[5] See discussion of damages below.