545 So.2d 588 (1989)
D & O CONTRACTORS, INC.
v.
TERREBONNE PARISH SCHOOL BOARD.
TERREBONNE PARISH SCHOOL BOARD
v.
D & O CONTRACTORS, INC.
Nos. 88 CA 0421, 88 CA 0422.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
Rehearing Denied June 23, 1989.
*589 Harold Dearie, II, Metairie, & John Hulse, New Orleans, for plaintiff and appelleeD & O Contractors.
Nel Vezina, Gretna, for defendant and appelleeTerrebonne Parish School Bd.
Terrence L. Brennan, New Orleans, for defendants and appellantsEugene J. Thibodeaux et al & INA Underwriters Ins.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SAVOIE, Judge.
This case concerns a project for resurfacing the running tracks at Terrebonne High School and South Terrebonne High School. The Terrebonne Parish School Board *590 (School Board) contracted with Eugene J. Thibodeaux Architect, Inc. for architectural services and with D & O Contractors (D & O) for the actual resurfacing. The material for the resurfacing, Reslite, was manufactured by Zemco Corporation (Zemco) and was distributed by Surfmark, Inc. (Surfmark).

PROCEDURAL HISTORY
On April 6, 1983, D & O filed suit against the School Board seeking payment of the retainage withheld under the contract, attorney's fees, and legal interest. The School Board filed a reconventional demand against D & O; Eugene J. Thibodeaux, individually, and Eugene J. Thibodeaux Architect, Inc. (hereinafter sometimes referred to collectively as "Thibodeaux"); Surfmark; Zemco; and several insurers.[1] The School Board alleged that all the defendants in reconvention were negligent and that D & O and Thibodeaux breached their contracts. The School Board sought damages of $168,070.00, which it alleged was the amount necessary to put the tracks in the condition anticipated had the performance of defendants in reconvention been proper.[2]
In response to the School Board's reconventional demand, D & O filed third party demands against Eugene J. Thibodeaux, individually; Eugene J. Thibodeaux Architect, Inc.; Surfmark; Zemco; and their insurers seeking indemnification or contribution should the School Board prevail on its reconventional demand against D & O.
On October 24, 1983, the School Board filed a separate suit, naming as defendants D & O; Eugene J. Thibodeaux, individually; Eugene J. Thibodeaux Architect, Inc.; Surfmark; Zemco; and these parties' insurers. The School Board made the same allegations as it had in its reconventional demand. This suit was consolidated with the earlier suit filed by D & O.
After a bench trial, the trial court rendered judgment in favor of the School Board and against Eugene J. Thibodeaux, individually; Eugene J. Thibodeaux Architect, Inc.; their insurer, INA Underwriters Insurance Co. (INA); D & O; its insurer, Commercial Union Insurance Co. (Commercial Union); and Surfmark for $55,000.00 for South Terrebonne High School. The trial court also rendered judgment in favor of the School Board and against Eugene J. Thibodeaux, individually; Eugene J. Thibodeaux Architect, Inc.; INA; D & O; and Commercial Union for $45,000.00 for Terrebonne High School. Additionally, the court rendered judgment in favor of D & O for indemnity on its third party demand against Eugene J. Thibodeaux, individually; Eugene J. Thibodeaux Architect, Inc.; and INA. Finally, the court found the School Board liable to D & O for the retainage owed D & O. The trial court dismissed all demands against Zemco. In its excellent written reasons for judgment the trial court made extensive findings of fact. We attach, as an addendum, those reasons for judgment.
From this judgment, Thibodeaux and INA appeal, raising the following assignments of error:
(1) The trial court erred in holding that Thibodeaux was negligent and/or in breach of its contract with the School Board.
(2) The trial court erred in holding that the School Board did not have to put on evidence of a professional standard of care in order to meet its burden of proof against Thibodeaux.
(3) The trial court erred in granting D & O's third-party demand for indemnity over against Thibodeaux and INA.

*591 (4) The trial court erred in holding that the School Board was entitled to $100,000.00 in total damages for repair of both of the running tracks.
(5) The trial court erred in awarding damages which included betterment to the School Board.
(6) The trial court erred by not reducing the amount of the damages awarded the School Board in an amount which represents the School Board's failure to mitigate its damages.
The School Board answered the appeal, contending that it should have been awarded damages of $200,000.00.

ASSIGNMENTS OF ERROR NOS. 1 AND 2: LIABILITY OF THIBODEAUX
The trial court found Thibodeaux at fault because he breached the required standard of care in designing the resurfacing project and because the problems experienced with the tracks after resurfacing were due to the faulty design.
Factual findings of a trial court will not be disturbed unless clearly wrong or manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). An architect has a duty to exercise the degree of professional care and skill customarily employed by other architects in the same general area. Milton J. Womack, Inc. v. House of Representatives, 509 So.2d 62, 64 (La.App. 1st Cir.), writs denied, 513 So.2d 1208, 1211 (La.1987). Normally, the party seeking to prove an architect's negligence must establish a deviation from the standard of care and skill by expert testimony. Womack, 509 So.2d at 65. However, in Womack this court recognized an exception to this general rule: "[w]hen the matter in question is one that can typically be understood without assistance from an expert, when a lay person can infer negligence, then expert testimony is not required." Womack, 509 So.2d at 66.
The School Board called Robert B. Anderson to testify as its expert. Anderson was accepted by the court as an expert engineer dealing with foundations, tennis courts, and running tracks. Anderson inspected each track several times, and reviewed the soil borings, the Project Manual, and the specifications. He testified that obvious items not included in the Manual and specifications were the application of herbicide or soil sterilant and repair of the cracks prior to the Reslite overlay and application of a sealer after the Reslite overlay. Anderson testified that the Project Manual did not require the contractor to do anything to the existing bases prior to the overlay. He said that the cracks in the present surface were reflection cracks, which are cracks on the new surface reflecting cracks on the surface below. According to Anderson, the failure to repair the existing cracks prior to resurfacing caused them to reflect. Anderson attributed the surface shedding to various causes: the effect of the cracks or lack of a sealer on the Reslite material, assuming that the Reslite was mixed properly, or failure of the tracks' bases.
On cross-examination, Anderson said that the results of the soil boring tests indicated that the track base was sufficient, if there was no other data. Anderson testified that he did not know whether the Reslite manufacturer recommended a sealer. He also stated that if a herbicide or soil sterilant was properly applied to these tracks prior to the overlay this would be acceptable. Anderson was asked whether based upon his review of the Project Manual and specifications, Thibodeaux performed his work in accordance with the standards of competent design professionals designing running tracks for the area. Anderson replied, "[e]verything that appears in the plans and specifications is competent."
Ed Dixon, accepted by the court as a civil engineering expert with experience in asphaltic surfaces, was called as a witness by D & O. Dixon testified that he examined the plans and specifications and the tracks themselves. Based on the plans and specifications, he testified that the contractor did not have to prepare the bases prior to any overlay work. According to Dixon, grass will grow through asphalt, and grass seeds will get into asphalt cracks and grow; Dixon further stated that grass will grow through a thin layer of asphalt unless treated with a herbicide. In Dixon's opinion, the cracks in the tracks were reflective *592 cracks and indicative of base failure. He said that, if when D & O finished its work there was no puddling on the tracks, but four years later there was a puddling problem, in his opinion irregular settlement was occurring on the tracks. Dixon testified that according to the plans and specifications the base appeared to be all right; he also said that he did not review the soil borings. According to Dixon, any present cracks on the tracks should be repaired prior to resurfacing or else the cracks would reoccur. Dixon testified that the plans and specifications were within the range of good design practice, but that if a design professional were aware of cracked or damaged areas, provisions should be made for repair prior to the overlay. He stated that if the contractor called to his attention the existence of soft spots, he would assess the problem and if it were serious, investigate. Dixon testified that it was his opinion the base had failed.
Thibodeaux called Lloyd J. Guillory to testify. Guillory testified as an expert architect who had designed four running tracks, two of which were Reslite. Guillory reviewed the plans and specifications, Thibodeaux's contract with the School Board, the Zemco specifications, and the soil borings report, and he inspected the tracks. Guillory testified that he felt the cracks in the tracks were contraction cracks and were not due to base failure. Guillory also said that the surface shedding was not due to base problems, and that there was no base failure occurring. Guillory opined that the plans and specifications were within the range of good architectural practice. He testified that the Zemco specifications do not advise the application of sealer until after a Reslite track has been used for ten years. Guillory testified that nothing in the soil borings report indicated any problems with the base. Guillory testified that based on the Project Manual, the contractor did not have to prepare the base prior to the overlay, but that he did have to level a depression one-half inch or greater. According to Guillory, a birdbath (a small area of standing water) is not indicative of base failure. Guillory gave no opinion as to the cause of the surface shedding. On cross-examination, Guillory testified that a large area of standing water would either be due to poor workmanship, base failure, or surface shedding. Guillory also stated that it is an architect's responsibility to insure general conformity with his plans and specifications. Guillory testified that if a D & O employee notified Thibodeaux about soft areas and Thibodeaux did not look into it before proceeding with construction, this would be a deviation from the standard of architectural practice. Guillory said in his construction of Reslite tracks, he applied a herbicide because the Zemco specifications required it.
Based on this testimony, the trial court found that the present cracks in the tracks were reflection cracks and that the plans Thibodeaux prepared did not include provisions for alleviating the cracks such as repairing them and applying a two inch asphalt overlay prior to the Reslite overlay. The court found that the surface shedding was due to the reflection cracks and "the deterioration of the material at the interface of the cracks" as well as the effects of standing water on the tracks. The court found that the water puddling problem was due to "softness in the base itself resulting in uneven settlement." The court found that the grass problem was due to the failure to apply a herbicide in conjunction with repair of the cracked bases. The court noted that Thibodeaux's failure to obtain the Reslite manufacturer's certification that it had inspected the bases and found them ready to receive the Reslite, prior to the overlay, showed a lack of appropriate steps in determining whether a Reslite overlay without prior corrective work on the bases would be feasible. The trial court then cited the Womack case and said that "the risk of overlaying cracked and depressed tracks without prior corrective work on the base and the failure to specify application of a herbicide to tracks which had grass growing through them" were matters from which the lay person could infer negligence, and that expert testimony from the School Board was not necessary.
After thoroughly reviewing the testimony regarding Thibodeaux's alleged negligence, we can not say that the trial court *593 was clearly wrong in finding Thibodeaux negligent. Expert testimony established that the project was negligently designed because Thibodeaux failed to require cracks in the track bases to be repaired prior to the Reslite overlay and because the plans did not require a soil sterilant or herbicide to be applied prior to the overlay. It was also established by expert testimony (including Thibodeaux's expert) that a prudent architect would stop the work and investigate any soft areas which the contractor encountered; this Thibodeaux failed to do when D & O informed Thibodeaux's representative of softness problems on the South Terrebonne track. The architect's negligence in design led to the cracking problem in both tracks, the surface shedding problem on both tracks, and the puddling problem on the South Terrebonne track. However the failure to include a herbicide application in the plans was not proven to be the cause of the present grass problems because Jeffery O'Malley of D & O applied Primatol, an acceptable soil sterilant or herbicide, to the tracks in accordance with the manufacturer's specifications, prior to the Reslite overlay.
Because we find that the expert testimony establishes Thibodeaux's breach of the standard of care required of an architect, we believe it was unnecessary for the trial court to apply the evidentiary exception set forth in Womack.
For the above and foregoing reasons, we find no merit to Thibodeaux and INA's Assignments of Error Nos. 1 and 2.

ASSIGNMENT OF ERROR NO. 3: D & O'S THIRD PARTY DEMAND FOR INDEMNIFICATION FROM THIBODEAUX AND INA
The trial court found D & O responsible to the School Board for the defects in the tracks, but found D & O entitled to indemnification from Thibodeaux and its insurer. The trial court found that D & O failed to comply with that portion of the contract which required D & O to furnish certifications from the manufacturer that the materials met the specified requirements; that the architectural plans and specifications complied with the manufacturer's standards; and that the finished surface would qualify for the manufacturer's warranty. The court then stated:
Mr. O'Malley was himself aware of the deficiencies in the specifications yet proceeded with the overlay without seeking the approval of the Reslite manufacturer. While the architect had a duty to insure that his specifications were adequate, D & O also undertook an obligation to protect the School Board by obtaining a certification form the manufacturer that the tracks would be properly overlaid, if the work was done as specified.
[S]ince D & O undertook the obligation to obtain the manufacturer's approval of the project's design, D & O must bear the burden to prove that the manufacturer would have certified the specifications. Having failed to do so, D & O cannot escape liability.
The court then reasoned: "[a]lthough the court finds D & O liable to the School Board for the damages sustained, the court concludes that the architect, who undertook the primary duty to prepare adequate plans and specifications, should bear the ultimate responsibility for the insufficiencies in the project's design."
Initially, we note that D & O did not appeal or answer Thibodeaux's appeal; therefore, the trial court's judgment that D & O is at fault and thus liable on the main demand is final.[3] Thus, we will review the trial court's finding of fault as to D & O only in respect to the indemnity claim. D & O's fault was active; it was not vicarious, technical, or constructive, or based upon strict liability. Indemnity is not available to a party who is actually negligent. Breaux Bridge Sugar Cooperative, Inc. v. LeBlanc, Schexnayder & Associates, 528 So.2d 250, 251 (La.App. 3d Cir.1988); see also Dusenbery v. McMoran Exploration Co., 458 So.2d 102 (La.1984). Nor is D & O entitled to indemnity under LSA-R.S. *594 9:2771, which relieves a contractor from liability for defects in the work where the defects were due to any fault or insufficiency in the plans and specifications, and the contractor constructed the work in accordance with the plans and specifications.[4] The trial court expressly found that D & O did not meet all the requirements of the plans and specifications; therefore, LSA-R.S. 9:2771 does not apply.
For these reasons, D & O is not entitled to indemnity from Thibodeaux and INA. However, under LSA-C.C. art. 1804 D & O is entitled to contribution.[5] LSA-C.C. art. 1804 reads as follows:
Art. 1804. Liability of solidary obligors between themselves
Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor.
A solidary obligor who has rendered the whole performance, though subrogated to the right of the obligee, may claim from the other obligors no more than the virile portion of each.
If the circumstances giving rise to the solidary obligation concern only one of the obligors, that obligor is liable for the whole to the other obligors who are then considered only as his sureties. D & O and Thibodeaux are solidarily obligors even though their obligations derived from separate contracts. LSA-C.C. art. 1797. Because the solidary obligation of D & O and Thibodeaux arose from contracts, D & O is entitled to contribution from Thibodeaux in the amount of Thibodeaux's virile share. LSA-C.C. art. 1804. According to LSA-C.C. art. 1804, "[i]f the obligation arises from a contract ..., virile portions are equal in the absence of an agreement or judgment to the contrary." For the foregoing reasons, Thibodeaux and INA's assignment of error has merit; we reverse the judgment of the trial court insofar as it grants D & O indemnity from Thibodeaux and INA; we amend the judgment to entitle D & O to contribution from Thibodeaux and INA for half of any damages it pays the School Board.

ASSIGNMENTS OF ERROR NOS. 4, 5, and 6, and ANSWER TO APPEAL: SCHOOL BOARD'S DAMAGES AWARD
The trial court awarded the School Board total damages of $100,000.00 based upon the testimony of Robert Anderson.
Anderson testified that for each track to be repaired to meet NCAA standards, the cost would be $80,000.00 to $100,000.00 per track; according to Anderson, this amount would include a two inch asphalt overlay prior to the Reslite overlay. Anderson then said that each track could be brought up to minimum standards for $100,000.00. This amount would include the cost of repairing the cracks and potholes, repairing the areas which were very low, applying a herbicide or soil sterilant, sealing the track, and relining the track.
On appeal Thibodeaux contends that the evidence does not support the damages *595 awarded, and the School Board contends that the evidence supports a greater damages award of $200,000.00
A trial court's award of damages will not be disturbed in the absence of an abuse of discretion. See Wilkinson v. Landreneau, 525 So.2d 617, 620 (La.App.3d Cir.1988). Reviewing the record with respect to testimony concerning damages, we can not say the trial court abused its discretion. The work covered by the $100,000.00 figure is necessary to repair the defects in tracks caused by the architect's negligence; furthermore, we find nothing in the record which would warrant an increase in the amount of this award. For these reasons, Thibodeaux and INA's Assignments of Error Nos. 4, 5, and 6, and the School Board's answer to the appeal have no merit.
For the above and foregoing reasons the judgment of the trial court is affirmed in part, reversed in part, and amended in part. The judgment is reversed as to the trial court's indemnification award in favor of D & O against Thibodeaux. The judgment is amended so that D & O is entitled to contribution against Thibodeaux and INA in the amount of its virile share, which is one-half. Costs of this appeal are assessed in the following proportions: 75% to Thibodeaux and INA, and 25% to the School Board.
AFFIRMED IN PART, REVERSED IN PART, AND AMENDED IN PART.

ADDENDUM NO. 1

D & O Contractors, Inc.

Versus No. 71,853

Terrebonne Parish School Board

CONSOLIDATED WITH

Terrebonne Parish School Board

Versus No. 74,028
D & O Contractors, Inc., et al
32nd Judicial District Court
State of Louisiana
Parish of Terrebonne
REASONS FOR JUDGMENT
These consolidated suits arise out of a project for resurfacing of running tracks at Terrebonne High School and South Terrebonne High School. The Terrebonne Parish School Board contracted with Eugene J. Thibodaux Architect, Inc. for architectural services and with D & O Contractors, Inc. for the actual construction of the resurfacing job. The resurfacing material, Reslite, was purchased from Surfmark, Inc. and was manufactured by Zemco Corporation. The School Board refused final approval of the resurfacing job and withheld ten percent of the contractor's fee. D & O Contractors, Inc. filed suit number 71,853 seeking recovery from the school board for the retainage. The School Board filed a reconventional demand against the contractor and a third party demand against the architectural firm, Mr. Euguene Thibodeaux, individually, the Reslite distributor and Reslite manufacturer, along with various insurance companies. The School Board alleged that there were defects in the project's design, its construction, and in the materials used. Additionally, the Terrebonne Parish School Board filed a separate suit, number 74028, reiterating its same demands against those it named in suit number 71853. That separate suit, seeking damages, was consolidated with suit number 71353 for trial in this division. D & O Contractors, Inc. filed a third party demand against Eugene J. Thibodeaux Architect Inc. and Eugene Thibodeaux individually.
In 1981, The Terrebonne Parish School Board determined that corrective work needed to be done on its running tracks located at Terrebonne and South Terrebonne High Schools. The existing tracks which had been used for many years had become cracked, areas of the tracks' surface were spoiling, and grass was growing through the surface of the tracks. The School Board was also concerned with a problem of water puddling on the tracks. The School Board consulted with Eugene J. Thibodeaux Architect, Inc. in order to establish a budget for the corrective work and to decide what work needed to be done to correct the problems existing in the tracks.
On November 5, 1981, two architects from the Thibodeaux firm, John Maciejunes *596 and Eugene Thibodeaux, inspected the tracks and discussed methods and costs of the resurfacing job. Some discussions were held regarding the possibility of ripping up the old tracks but that method was not pursued because of the cost involved. Two alternatives were explored. The first alternative provided for an overlay of one inch of a surfacing material known as Reslite which is an asphatic pavement. Reslite is a bituminous mixture composed of a combination of resilient and pliable aggregate, fine mineral aggregate, and bituminous binder. This type of resurfacing was represented to the school board as having a life expectancy of ten years at a cost of approximately $70,000 per track. The second alternative discussed was application of a 3/16 inch cold mix resurfacing sealer known as Nu-Track having a life expectancy of two to three years and costing approximately $23,000 per track. The School Board officials had seen several Reslite tracks with which they were impressed and the decision was ultimately made to adopt the first alternative and resurface with a one inch layer of Reslite.
The School Board called to Mr. Thibodeaux's attention the problems that existed in the old tracks and Mr. Thibodeaux was aware that the school board wanted the problems corrected. A project budget of $155,000 was set in consultation with Mr. Thibodeaux. The School Board contracted with the Thibodeaux firm on December 16, 1981 for the site work and resurfacing of the tracks. The Thibodeaux firm agreed in that contract to furnish all architectural services necessary to design the project, administer the construction contracts and supervise the work. For such services, the Thibodeaux firm was to receive fifteen percent of either the construction cost or the design budget, whichever was the lesser.
Mr. Thibodeaux, after inspecting the tracks, determined that additional drainage work would be necessary at South Terrebonne High School because of a water puddling problem existing on the track. He requested the School Board to authorize payment for soil boring tests to be done at South Terrebonne High School because of potential softness of the track. Mr. Maciejunes requested a soil engineer's report the purpose of which was to determine why some areas of the South Terrebonne High School track had settled and others had remained level. Soil borings were made and Mr. Maciejunes, on February 17, 1982, reported to the School Board that he had reviewed the results of the soil borings with the soil engineer and had concluded that the track base needed no improvement for use as a running track. He informed the School Board that, although water content in some areas was more than desirable, it could be eliminated with subsurface drainage.
Both Mr. Thibodeaux and Mr. Maciejunes participated in the design of the project. Although Mr. Maciejunes actually wrote most of the project manual, Mr. Thibodeaux approved of its contents. No evidence was presented that Mr. Thibodeaux made any effort to alter the specifications. On the contrary, at trial, he defended the competency of the specifications and often referred to them as his own. Although both architects of the firm participated in the design of the project, Mr. Maciejunes was designated by the firm as its representative who was to be on site for the actual construction. Mr. Thibodeaux did visit the construction site for a short time on one of the days during which the Reslite was being applied.
The project was put out for public bid. The School Board accepted the bid of D & O Contractors which was comprised of a base bid of $146,160 with three additional components; 1) related track surfacing in the amount of $6,510; 2) site drainage work at South Terrebonne High in the amount of $9,400, and 3) a three year warranty for $6,000. D & O's total bid which the School Board accepted was $168,070.00.
The project manual called for a one inch overlay of Reslite material over the existing base. Both Mr. Thibodeaux and Mr. Maciejunes testified that they did not expect or require any leveling course overlay prior to the application of the Reslite. With respect to irregularities existing in the original track surface, Mr. Thibodeaux testified that he anticipated the contractor *597 would simply apply more Reslite to fill in any depressions so that the track surface would conform to uniform lines and grades. Mr. Maciejunes testified that he was aware that the existing base surface was spoiling and that the spoiled areas would have to be removed so as to lay the Reslite over a nonspoiling base. Although Mr. Thibodeaux and Mr. Maciejunes were aware of the problem with grass growing through the old tracks, they included no requirement in the project manual for a herbicide to be applied prior to the overlay.
The project manual on which the contractor was to base his bid contained a provision that has been the focus of much controversy in this case. Section 02500 Part 2.00 Subsection B. provided:
Preparation and Requirements of the Base (By Others):
After the base and leveling course have been prepared to uniform and proper lines and grades, a tack coat conforming to State Specifications shall be applied prior to placing the Reslite. The Reslite application shall be made over the surface at a thickness of one (1) inch. Slag aggregates will not be used in base or leveling course.
Mr. O'Malley of D & O Contractors testified that he interpreted the specifications as calling for a preparation of the base to be performed "by others" prior to his application of the Reslite material. He did not include in his bid calculation any factor for preparation of the base by D & O. After D & O Contractors was awarded the contract, Mr. O'Malley contacted Mr. Thibodeaux to inquire when the base preparations would be completed so that he could begin work. Mr. Thibodeaux informed him that no preparations were going to be made on the existing base. When Mr. O'Malley learned that no one was going to prepare the base, he became quite concerned and requested to be relieved of the requirement that there be no greater deviation in the Reslite surface greater than one-fourth inch when checked with a ten foot straight edge. Mr. Thibodeaux did not relieve him of that requirement, however, Mr. Thibodeaux did assure him that the lines and grades were relatively good. Mr. O'Malley testified that, as a result of his conversation with Mr. Thibodeaux, he assumed the tracks were relatively level.
The Reslite surface was applied to the South Terrebonne High School track on October 29, 1982 and to the Terrebonne High School track the following day. John Maciejunes, acting on behalf of the Thibodeaux firm, was present on site for the mixing of the Reslite at the plant for the South Terrebonne High track and during its application. He was not present at the mixing plant on the second day when the mix was prepared for the Terrebonne High track and was only present for about one and one-half hours at the Terrebonne High School track while the Reslite surface was applied.
Prior to the Reslite application, D & O did the drainage work at South Terrebonne High School anticipated by the contract. During the course of this work a ready mix truck was driven onto the northeast corner of the track to pour some concrete. One wheel of the truck broke through the track surface and caused a rut. Mr. O'Malley notified the Thibodeaux firm of the problem of softness in base. Mr. Maciejunes instructed Mr. O'Malley to fill in the area with more Reslite. He did not direct that any corrective work be done to the base prior to the overlay nor did he initiate any steps to further investigate the extent of softness in the base.
In addition to the problem with the truck breaking through the track surface, Mr. O'Malley called to Mr. Maciejunes' attention the problem with grass growing through the tracks. Although the job specifications did not call for application of a herbicide, Mr. O'Malley was concerned about the problem with the grass on the tracks. Neither Mr. Maciejunes nor Mr. Thibodeaux instructed him to apply a herbicide and he was not bound by the contract documents to do so. However, he felt it needed to be done. Mr. O'Malley testified that, using a motor grader, he cut off the grass that was on the tracks and applied Primatol, a sterilant, over the tracks.
*598 A representative from the manufacturer and distributor of the Reslite were on site during the construction process to assist with the mixing of the Reslite. The specifications prepared by the Thibodeaux firm provided in Section 02500 Part 3 Paragraph H:
Certificates and Certification:
The manufacturer of all-weather surfacing material shall have a representative inspect and approve the existing base, or alter the existing base in a manner acceptable to Zemco.
The manufacturer of the surfacing materials shall inspect with the Architect and Owner all substrate surfaces which are to receive the all weather surfacing and if any work involved is not proper or ready to receive the surfacing, then the manufacturer's representative shall notify the Contractor, sending a copy of the letter to the Architect stating what work needs to be corrected or provided. If after the inspection of the substrate surfaces, everything is proper and ready to receive the surfacing, then the all weather manufacturer shall certify in writing that he has inspected the substrate surfaces and systems and that all work performed is satisfactory to him and the substrate is proper and ready to receive the surfacing.
Mr. Maciejunes testified that he and representatives from the manufacturer and distributor walked around the track and talked about it. He testified that Don Cross, the distributor's representative, was supposed to arrange for someone to come to approve the base. He tried to contact Mr. Cross the following week for approval of the base but had no record in his file of anyone's having made such an approval. He did testify however, that Don Cross of Surfmark verbally certified that the base was ready.
The project manual further provided in Section 02500 Part 1.00 Paragraph C:
Submittals:
Material Certificates: Provide copies of materials certificates signed by material producer and Contractor, certifying that each material item complies with, or exceeds, Specified requirements. Provide manufacturer's certification that the architectural plans and specifications comply with the manufacturer's requirements and standards and that the finished surface will qualify for their standards and that the finished surface will qualify for their warranty-guarantee. If documents do not comply, then make recommendations to Architect for the necessary corrections.
Mr. O'Malley admitted that he did not provide these certificates. Furthermore, he testified that neither Surfmark nor Zemco issued him any warranty for the performance of the Reslite.
Mr. O'Malley testified that, as he laid the Reslite surface, he did not take measurements to ascertain that it was uniformly sloped or leveled. His position was that the base should have been prepared to uniform lines and grades by others before his overlay of the Reslite. He explained that his method of assuring an overlay of a minimum of one inch after compaction was to measure the thickness of the Reslite as it was poured. He testified that he poured a one and one-quarter inch thickness and that he expected the Reslite to compact one-quarter inch or less. Mr. Maciejunes testified that, although there were irregularities in the base surface, he did not feel that an additional leveling course was necessary. He testified that, although some of the spoiled surface had to be scraped creating depressions in the surface, he thought that D & O's machine was laying down enough Reslite to compensate for the depressions. He felt that there were areas where the Reslite exceeded one inch. He determined this to be an acceptable method in conformity with the specifications. He admitted however that he did not take measurements with a ten foot straight edge after compaction to determine if there was at least a one inch Reslite surface.
Both Mr. Thibodeaux and Mr. Maciejunes inspected the tracks after the project was completed. Mr. Thibodeaux testified that he made some measurements on some of the problem areas at Terrebonne High *599 School with a ten foot straight edge and from what he could determine D & O had substantially complied with the plans and specs. He did not however take any such measurement at South Terrebonne High School. He testified that he made a visual inspection of the South Terrebonne High School track. An inspection report was made on November 15, 1982 which noted that grass was growing through the tracks and some puddles had developed. Mr. Thibodeaux testified that he instructed the contractor to repair the low spots and that he did so. A subsequent inspection was made on December 6, 1982 during which the problem with grass growing through the tracks was again noted. The architect recommended acceptance of the tracks pending completion of trenching the inner and outer edges of the tracks and applying Round Up, a herbicide, to treat the grass problem. A low spot was also noted in Lanes 4 and 5 on the West End of the Terrebonne High School track. The contractor was scheduled to repair this area and acceptance of the track was made contingent upon this repair.
Mr. Thibodeaux issued a certificate of substantial completion on December 6, 1982 attached to which was a punch list of items that needed to be repaired. D & O Contractors remedied the problems noted except for those related to the grass. Mr. O'Malley testified that he did not agree to take any action in this regard since the specifications had not required him to address the problems with grass.
On February 1, 1983 the School Board voted to accept substantial completion of the tracks and to accept final completion subject to the following conditions:
1) That water puddling on the tracks be corrected by the contractor.
2) That the tracks be treated with a herbicide, for a period of one year at no expense to the School Board.
3) That the manufacturer of the Reslite certify in writing that he has inspected the substrate surfaces and systems and that all work performed was satisfactory to him and the substrate was proper and ready to receive surfacing.
The School Board paid the architectural firm in full and paid D & O it's full contract price minus the ten percent retainage. No further payment was made to D & O.
The primary problem concerning the School Board in the initial post construction period was the appearance of grass growing through the tracks so soon after the project's completion. Although some low spots had initially been noted, these were repaired by the contractor and the tracks' puddling water problem was temporarily relieved. The School Board followed the architect's recommendation in treating the grass problem. They trenched out the sides of the tracks and applied Round Up. They then undertook a regular program of applying herbicide to the grass. In spite of the School Board's efforts to kill the grass, it reappeared and has continued to do so. Although some question was raised at trial about the adequacy of the School Board's effort to treat the grass problem as recommended, the court finds that the tracks were trenched as recommended and that the School Board made reasonable efforts under the circumstances to control the grass problem.
Within six months of the project's completion the School Board began to notice that the tracks were shedding the surface material. Loose granules began to accumulate on the tracks to the extent that the School Board had to blow off the shedding material prior to track meets. Low spots began to appear in the tracks causing a reoccurrence of the puddling problem they had originally attempted to solve by undertaking the project. By the time school commenced for the fall 1983 session, cracks started to appear in the surface of the tracks in substantially the same locations as they had existed prior to the overlay project.
The court personally inspected the tracks prior to the commencement of trial and observed numerous cracks in both tracks, some of which exceeded ten feet in length. The court noted numerous areas where grass was growing through the surface of both tracks. The court's inspection took place shortly after it had rained. The court *600 observed several areas of standing water on both tracks. Additionally, the court observed the extent of the shedding of the tracks' surfaces and found them to be quite slippery in some locations. In essence, the court found the testimony of the School Board employees as to the extent of the cracks, grass, water puddling, and track surface shedding to be supported by its own visual inspection.
The court finds that the failure to adequately prepare the existing track bases prior to the Reslite overlay was the cause of the reoccurrence of the cracks, the water puddling problem, the surface shedding and the grass growing through the tracks.
The court finds that the cracks which appeared in the Reslite surface were in substantially the same spots as had existed in the original bases. The court accepts the testimony of Mr. Anderson, the School Board's expert in structural engineering, as to the most probable cause of the appearance of the cracks in the Reslite. He testified that the cracks appeared to be reflection cracks, reflecting from the original cracks in the base. According to Mr. Anderson, the most probable cause of the reflection cracks was the nonhomogeniety of the base. He testified that, because of the presence of numerous cracks in the existing base, he would have expected a significant amount of the cracks to reflect if a one inch layer of Reslite was applied to a cracked base. He explained that, to alleviate this problem, he would have included provisions in the specifications for repair of the cracks in the base and application of a two inch overlay of asphalt prior to the Reslite overlay.
The court finds the amount of surface material shedding from the tracks to be greater than should have been expected. Mr. Anderson testified that the debonding of the Reslite material could be attributed to the reflection cracks and the deterioration of the material at the interface of the cracks. The court finds this the most probable explanation for the surface deterioration together with the effects of standing water on the tracks attacking the surface.
The court finds that the reoccurrence of the water puddling problems on the tracks was due to softness in the base itself resulting in uneven settlement which caused the tracks to again retain standing water. After D & O's work was performed there was temporary relief of the standing water problem. This fact leads the court to conclude that D & O did overlay the Reslite so that the resulting surface was to uniform lines and grades on both tracks. However, no corrective work was undertaken on the soft or quick areas of the base when this problem was discovered during the course of the job. The court finds that subsequent settlement caused the depressions in the tracks to reappear.
The court finds that, regardless whether D & O complied with the requirement to overlay a minimum of one inch of Reslite, the design of the project was faulty from the outset, considering the condition of the base. The court finds that the Thibodeaux firm was aware of the cracked condition of the base and the problems experienced by Mr. O'Malley with softness in the base when he began the job and his equipment broke through the base surface. They were also aware that there were irregularities in the base surface that held standing water prior to the overlay job. The risk of overlaying the Reslite over a cracked and depressed base was recognized by Mr. O'Malley who expressed his concern to the Thibodeaux firm. The Thibodeaux firm should have been alerted to the potential problems with the base, if not at the outset, then at least at the point when Mr. O'Malley reported the problems he experienced with softness in the base. The architect's own expert admitted that, if quick or soft spots were called to the architect's attention, the failure to investigate further would constitute a deviation from the standard of care expected of an architect. Mr. Maciejunes, when notified of the truck's wheel having broken completely through the base surface, merely instructed Mr. O'Malley to fill it in with Reslite.
The court finds that the specifications should have contained a provision for repair of the cracks in the base and application of a sterilant prior to the Reslite overlay. *601 Thibodeaux was aware that one of the problems the School Board had with the old tracks was the grass growing through the surface. Thibodeaux contends that the issue of his failure to include such a provision in the specifications is moot because Mr. O'Malley did apply a sterilant to the tracks prior to laying the Reslite. The court must disagree. Mr. O'Malley applied a sterilant to the existing base. However, he undertook no corrective work on the base nor was he required to do so by the specifications. Had the proper corrective work on the base been specified, the application of a sterilant in connection with that work would have probably cured the problem with grass growing through the Reslite surface. The grass now growing through the Reslite surface is primarily in the areas of the reflection cracks. Had proper steps been taken to avoid the reflection of cracks from the base through the Reslite surface, the problem of the grass growing through the track would more likely than not been solved.
Eugene J. Thibodeaux Architect, Inc. prepared the plans and specifications for the resurfacing project and cannot shift its responsibility for the adequacy of the plans and specifications to the contractor, the Reslite manufacturer and distributor or the School Board.
The School Board sought and relied on Thibodeaux's recommendations in establishing the budget for the project. Mr. Thibodeaux testified that the decision to overlay the existing tracks rather than tear them up and build new tracks was made by the School Board. The court finds, however, that implicit in Thibodeaux's contract was a duty to advise the School Board of the best alternative of those available considering all of the circumstances. The School Board obviously had no expertise in overlaying running tracks. The School Board called to Thibodeaux's attention the problems they had with the tracks. Thibodeaux was certainly aware that the purpose of the project was to cure those problems. Under these circumstances, he had the duty to advise the School Board of the risks involved in overlaying the old tracks. He at no time informed the School Board that there was any risk that the overlay job would fail to cure the problems that existed with the old tracks. While Thibodeaux contends he relied on the manufacturer's expertise, he presented no evidence of his attempt to insure that the manufacturer had certified in writing as required by the specifications which he prepared that it had inspected the substrate surfaces and systems and that the substrate was proper and ready to receive the surfacing. The purpose of the specification provision requiring this certificate was to protect the School Board by obtaining for it a binding representation from the manufacturer upon which it could rely. Without this certification the School Board was left with only the assurance by Mr. Maciejunes that the manufacturer's representative walked around the track and "looked at it." Evidence was presented of an after the fact "certification" issued by Don Cross of Surfmark, the Reslite distributor. However, no certification was issued by Zemco, the manufacturer. The failure of the Thibodeaux firm to see to it that a manufacturer's certification was secured evidences the lack of appropriate steps taken to insure that the Reslite overlay without prior corrective work on the base would be feasible. Mr. O'Malley's failure to secure the material certificates required by Section 02500 Part 1.00 Paragraph C, although constituting a breach of the requirements of the specifications, does not relieve Mr. Thibodeaux of his duty to furnish adequate specifications. The architect has an independent duty to insure that his specifications are appropriate. He cannot prepare specifications and then wash his hands of the matter, relying on someone else to do the job he has contracted to perform. This is particularly true where the architect undertakes the responsibility for contract administration.
Thibodeaux contends that there can be no finding of liability on his part without the plaintiff's producing expert testimony to establish the standard of care applicable to others in defendant's profession. Without such evidence, defendant contends that the court cannot find that Thibodeaux *602 breached the standards applicable to his profession. The First Circuit Court of Appeals recently addressed this issue. The court concluded that testimony from an expert is not always necessary to establish the negligence of an architect acting in his professional capacity. When the matter in question is one that can typically be understood without assistance from an expert, when a lay person can infer neglgigence, then expert testimony is not required. M.J. Womack, Inc. v. State House of Representatives, 509 So.2d 63, [62] (La.App. 1st Cir.1987). Considering the method by which that standard of proof was applied to the facts in the Womack case, this court finds that the risk of overlaying cracked and depressed tracks without prior corrective work on the base and the failure to specify application of a herbicide to tracks which had grass growing through them were matters within the common understanding of laymen. The court finds, therefore, that plaintiff was not required to produce specific expert testimony of the standards of care possessed by others in Thibodeaux's profession dealing with this precise problem. Mr. Anderson, plaintiff's expert in structural engineering, testified that the problem of reflective cracks would have been cured by an overlay of two inches of asphalt prior to the Reslite application. Even Mr. O'Malley recognized the danger of overlaying the tracks without proper corrective work on the base. He testified that during his years of experience in asphaltic overlays he has seen cracks appear with overlays of one inch depth. He also recognized the need to apply herbicide to the tracks. If these problems were recognizable by Mr. O'Malley, they certainly should have been within Thibodeaux's expertise to discover.
The court finds that Eugene J. Thibodeaux Architect, Inc. and Mr. Thibodeaux, in his individual capacity as an employee of the firm, breached the standard of care expected under the circumstances in designing the overlay project and that the faulty design of the project caused the problems which appeared in the tracks after completion of the job.
The court must now determine what responsibility must be borne by D & O Contractors, Inc. for the defects existing in the running tracks.
Having found that the specifications for the overlay were defective, D & O's role in the project's failure must be viewed in light of that fact. The court finds that the problems existing in the tracks were not due to the failure to apply a minimum of one inch of Reslite to the tracks to uniform lines and grades. Rather, the defects were due to the absence of any corrective work done to the base of the tracks prior to the overlay of the Reslite. Therefore, the court finds that any failure of D & O to overlay the material as specified is irrelevant. In any event, the court has concluded that D & O did lay a minimum of one inch of Reslite to the tracks.
The court finds, however, that D & O Contractors, Inc. did breach the terms of their contract by failing to comply with the requirements of Section 02500 Part 1.00 Paragraph C. D & O failed to provide a certification by the manufacturer that the architectural plans and specifications complied with their requirement and that the finished surface would qualify for their warranty-guarantee. Mr. O'Malley was himself aware of the deficiencies in the specifications yet proceeded with the overlay without seeking the approval of the Reslite manufacturer. While the architect had a duty to insure that his specifications were adequate, D & O also undertook an obligation to protect the School Board by obtaining a certification from the manufacturer that the tracks would be properly overlaid, if the work was done as specified.
The court finds that, since D & O undertook the obligation to obtain the manufacturer's approval of the project's design, D & O must bear the burden to prove that the manufacturer would have certified the specifications. Having failed to do so, D & O cannot escape liability. The court finds, therefore, that D & O Contractors, Inc. is also responsible to the School Board for the project's failure, and that the School Board was justified in withholding full payment since D & O breached the terms of its *603 contract. D & O should be cast for the damages assessed below but should receive a credit for the amounts withheld by the School Board.
Although the court finds D & O liable to the School Board for the damages sustained, the court concludes that the architect, who undertook the primary duty to prepare adequate plans and specifications, should bear the ultimate responsibility for the insufficiencies in the project's design. The court finds that judgment should be rendered in favor of D & O Contractors, Inc. on its third party demand against Eugene J. Thibodeaux Architect, Inc. and Eugene Thibodeaux, individually, for indemnity for all damages assessed in favor of the School Board and against D & O Contractors, Inc.
The School Board contends that judgment should be rendered against Zemco Corporation, the Reslite manufacturer, and Surfmark, Inc., the Reslite distributor, for failure of the Reslite material to perform as expected. The School Board invokes the doctrine of res ipsa loquitur which it contends applies in this case to shift the burden to Zemco and Surfmark to prove that the product was not defective. The court finds that doctrine inapplicable in this case. Although there was evidence that representatives of Zemco and Surfmark assisted in the mixing of the surfacing material, their agents did not have exclusive control over the overlay process. Furthermore, there was ample evidence of other plausible explanations for the tracks' failure besides the theory of defective material. Therefore, the court finds the School Board cannot rely on the doctrine of res ipsa loquitur to prove its case.
The court finds that the School Board has not proved by a preponderance of the evidence that the Reslite material was defective. Rather, the court believes that the failure of the Reslite to perform as intended was due to the initially flawed design of the project, the overlay of the Reslite without adequate corrective work on the base of the tracks.
The court must therefore consider whether Zemco or Surfmark bore any responsibility for the decision to overlay the tracks without proper preparation of the base. Zemco was not a party to the contract which governed the conduct of the School Board, the architect and the contractor. Therefore, the School Board has not established that Zemco undertook any contractual obligation to participate in or oversee the construction process or to be bound by any of the provisions of the project manual which call for the manufacturer to inspect the substrate surfaces. Although there was evidence that Zemco had a representative at the batch plant assisting in or even overseeing the mixing of the Reslite, there was no evidence that any Zemco representative participated in or directed the overlay portion of the job. Zemco did not provide any written certification of its inspection of the base as was anticipated by Section 02500 Part 3 Paragraph H of the project manual. Zemco was not a party to the contract and, therefore, was not bound by that provision. Without any evidence that Zemco undertook an obligation to participate in or direct the overlay job, the court cannot find that Zemco breached any duty to determine whether the Reslite should be applied over the base in its unprepared condition.
Surfmark, though in a similar position in this case as Zemco with respect to the lack of a contractual duty, did have a representative approve the substrate surfaces at one of the tracks. Don Cross, Surfmark's representative, certified by letter dated February 16, 1983, that he had, on October 29, 1982, inspected the substrate surfaces at the South Terrebonne High School track and found them "proper and ready to receive the Reslite surfacing." Although Surfmark was not a party to the contract, it did undertake a duty to inspect the substrate surfaces. Mr. Cross' letter evidences Surfmark's assumption of that responsibility.
Surfmark was served but did not answer the School Board's petition. On August 26, 1986, a preliminary default was rendered against Surfmark. The court finds that confirmation of that default is appropriate and that Surfmark should be held liable for *604 the damages to be assessed below attributable to repair of the South Terrebonne track.

DAMAGES
Mr. Anderson testified that to bring the tracks up to minimum standards, the damaged areas at the reflection cracks would have to be cut out two to three inches below the Reslite, the base refilled with asphalt, and the repaired areas overlaid with Reslite. He testified that restoration of the tracks would not include bringing the tracks up to a one inch thickness of Reslite throughout. Only the very low areas would receive additional Reslite. He testified that, prior to the corrective work, a herbicide would have to be applied to these areas. He recommended that, wherever grass is growing through the surface, the track should be dug out to a minimum depth of twelve inches, a herbicide should be applied and the track should be repatched. Mr. Anderson estimated the cost to bring the tracks up to minimum standards at $55,000 for South Terrebonne High and $45,000 for Terrebonne High.
Although Mr. Anderson testified that repair of the tracks up to a first class NCAA standard would cost approximately $200,000, he did not give details about the nature of the work required to achieve this standard. Without such evidence, the court finds that the School Board has failed to sustain its burden to justify damages in that amount.
The court accepts the testimony of Mr. Anderson as a reasonable estimate of the cost of repairing the tracks up to normal running track standards. Accordingly, the court finds that the School Board is entitled to recover the costs of repairing both tracks from Eugene J. Thibodeaux Architect, Inc., Eugene Thibodeaux, and D & O Contractors, Inc. The School Board is also entitled to recover the costs of repairing the South Terrebonne High School track from Surfmark, Inc. D & O Contractors, Inc. should be given credit against the amounts for which judgment is cast against it for the ten percent retainage of its fee by the School Board.
The court finds that the School Board is not entitled to an award of attorney's fees against any of the defendants since attorney fees were not contracted for and no statute authorizes such recovery in this case. In its post trial brief, the School Board argues that an award of attorney's fees is appropriate, considering Article 7 Section 7.5.1 of the General Conditions of the contract in light of the rationale of Town of Winnsboro v. Barnard & Burk, Inc., 294 So.2d 867 (La.App. 2nd Cir.1974). The court finds the cited case distinguishable and therefore inapplicable. In Town of Winnsboro, the specifications governing the project specifically called for the payment of reasonable attorney's fees for enforcement of the contract and institution of legal proceedings. Article 7 Section 7.5.1 of the General Conditions of the contract require furnishing of a bond to cover the faithful performance of the contract and payment of all the obligations arising thereunder. The court finds that, since no contractual stipulation for payment of attorney's fees was made, the "obligations arising thereunder" referred to in Section 7.5.1 cannot be said to include the payment of attorney's fees. Absent a contractual obligation to pay attorney's fees, recovery must be denied unless authorized by statute. The School Board has not referred the court to any statutory authorization for imposition of attorney's fees in this case. Therefore, the School Board's claim for attorney's fees must be denied.
Defendant, INA, sued as the insurer of Eugene J. Thibodeaux Architect, Inc. and Eugene Thibodeaux, contends that the failure of the School Board to introduce the insurance policy into evidence prevents the entry of judgment against it. INA, answering the claim of the School Board, admitted the existence of an insurance policy but avered that the written document was the best evidence of its terms and conditions. The court believes that, rather than making a determination whether INA's answer was sufficient to admit coverage for the acts of the Thibodeaux firm and Mr. Thibodeaux, the more equitable approach would be for the court to reopen *605 the record for the limited purpose of introduction of the policy into evidence. Therefore, the court hereby orders INA to furnish the court with a certified copy of its policy no later than fifteen days after the mailing of notice of these Reasons for Judgment. After receipt of the policy and introduction of it into evidence, the court will sign a judgment consistent with the reasons expressed herein.
Houma, Louisiana, on this the 2nd day of September, 1987.
 /s/ Timothy C. Ellender
 Judge
NOTES
[1] The insurers made defendants in reconvention by the School Board were as follows: Commercial Union Insurance Co. (Commercial Union) as the provider of D & O's surety bond; Querbes and Nelson, Inc. as Thibodeaux's insurer; and INA Underwriters Insurance Co. (INA) also as Thibodeaux's insurer. The School Board subsequently dismissed its reconventional demand as to Querbes and Nelson, Inc.
[2] The School Board also filed a third party demand against Eugene J. Thibodeaux, individually, Eugene J. Thibodeaux Architect, Inc., and Querbes and Nelson, their insurer, seeking indemnification or contribution if the School Board were found liable to D & O on the main demand.
[3] D & O did file an answer to Thibodeaux and INA's appeal wherein D & O sought to have the trial court's finding that it was liable to the School Board reversed. D & O later filed a motion to dismiss its answer to the appeal, which was granted by this court on April 21, 1988.
[4] LSA-R.S. 9:2771 reads as follows:

§ 2771. Non-liability of contractor for destruction or deterioration of work
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
[5] Thibodeaux and INA contend that D & O is not entitled to contribution because its third party demand did not specifically pray for it. We disagree. The allegations made by D & O in its third party demand were sufficient to support a claim for indemnification or contribution. According to the Louisiana Code of Civil Procedure, provided the facts alleged are proved, a party may be granted any relief to which he is entitled under the facts pled and the evidence. LSA-C.C.P. arts. 854, 862, 891, 1003, 1004; see also City of Martinville v. Johnson, 465 So.2d 280, 282-283 (La.App. 3d Cir), writ denied, 467 So.2d 1133 (La.1985).